603 F.2d 862
 101 L.R.R.M. (BNA) 2628, 99 L.R.R.M. (BNA) 2903,
195 U.S.App.D.C. 280, 84 Lab.Cas. P 10,865,
86 Lab.Cas. P 11,372
 LOCAL 777, DEMOCRATIC UNION ORGANIZING COMMITTEE, SEAFARERS
INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
YELLOW CAB COMPANY and Checker Taxi Company, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Local 777, Democratic Union, etc., Intervenor.
 Nos. 77-1512, 77-1673.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 13, 1978.
Decided Oct. 20, 1978.
Rehearing Denied June 20, 1979.
As Amended July 5 and 27, 1979.
 
 Joel H. Kaplan, Chicago, Ill., for petitioners in No. 77-1673.
 Robert E. Haythorne and D. Lawrence Gunnels, Chicago, Ill., were on the brief, for petitioners in No. 77-1673.
 Irving M. Friedman, Chicago, Ill., with whom David Jaffe was on the brief, for petitioner in No. 77-1512 and intervenor in No. 77-1673.
 Candace M. Carroll, Atty., N. L. R. B., Washington, D.C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John D. Burgoyne, Asst. Gen. Counsel, Washington, D.C., were on the brief, for respondent.
 George D. Webster and Arthur L. Herold, Washington, D.C., were on the brief, Amicus Curiae, urging denial of enforcement of the Board's order.
 Also Ronald Rosenberg, Washington, D.C., entered an appearance for petitioners in No. 77-1512 and intervenor in No. 77-1673.
 Before TAMM and MacKINNON, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 Opinion for the court filed by MacKINNON, Circuit Judge.
 MacKINNON, Circuit Judge:
 
 
 1
 The Yellow Cab Company and the Checker Taxi Company (hereinafter "Yellow" and "Checker" and "the Companies")[1] in Chicago, petition pursuant to Section 10(f) of the National Labor Relations Act (the "Act"), as amended (61 Stat. 136, 73 Stat. 519, 88 Stat. 395, 29 U.S.C. § 151 Et seq.) for review of a decision and order of the National Labor Relations Board (the "Board")[2] requiring the Companies to recognize Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America, AFL-CIO (the "Union") as the representative of their lessee cab drivers.[3] The Board, pursuant to section 10(e) of the Act, has filed a cross-application for enforcement and the Union has itself filed a petition for review insofar as the Board's order failed to grant certain remedies.[4]
 
 I. FACTS
 A.) Background of the Leasing Decision
 
 2
 The dispute which precipitated this litigation arose as a result of the decision by Checker and Yellow to inaugurate a cab-leasing program as an alternative to the commission arrangement they had used exclusively until 1975.[5] Under the leasing system all the cab companies receive is a flat rate for the use of a cab and a "medallion." Under the commission system the sole compensation to the Companies is a certain percentage (approximately 50%) of the total fares paid to the cab drivers.
 
 
 3
 In 1974, the Companies, suffering a decline in earnings, based in part on the increasing scarcity of full-time commission drivers, decided to embark on a leasing program.[6]
 
 
 4
 By December of 1974, the companies had developed detailed plans concerning the use of subsidiaries to begin leasing operations, and they sent the Internal Revenue Service a summary of their proposed operation requesting a ruling that the lessees were independent contractors and not employees for federal tax purposes. A favorable ruling was granted some three months later in March of 1975.
 
 
 5
 Immediately upon receipt of the favorable IRS ruling, Yellow applied to the Commissioner of Consumer Sales, Weights, and Measures for the transfer of 50 of its 2,166 licenses to its subsidiary, Bell Cabs, in order that leasing operations might begin. Meanwhile, the Union had begun a virulent campaign against the leasing plan, denouncing it as a "union-busting tactic" and threatening a retaliatory cab strike. In late May, the Commissioner announced that he would not approve the transfer of licenses to Bell. At this point, Yellow and Checker abandoned their plans to establish subsidiaries to run their leasing operation and decided instead to lease their cabs directly to the drivers.
 
 
 6
 Accordingly, they requested a supplemental ruling from the IRS that if they did so the lessee drivers would still not be considered employees for tax purposes. This ruling was eventually rendered in October 1975, sometime after actual leasing operations had begun.
 
 
 7
 After the companies decided to utilize direct leasing rather than forming subsidiaries, they informed the Union of their intentions and invited discussion before they arrived at a final decision. Two meetings were held between the parties, on June 5 and 17, 1975. At these meetings the Union manifested its categorical opposition to the idea of leasing[7] and its "pattern of conduct prior to and during the June meetings indicates that it was resigned to the belief that negotiations would be futile, and that its opposition to leasing would have to be sustained in the arenas of political and legal combat."[8] The Union also considered the leasing program simply to be a modification of the current collective bargaining agreement and insisted that it be recognized as the representative of the lessee drivers, since it had been certified to represent all drivers employed by the Company. The Union left no doubt that, even were the companies willing to bargain about a modification of the leasing program, it would not do so until it was recognized as the representative of the lessee drivers.[9]
 
 
 8
 After the second meeting had ended in impasse, the Company declined the Union's request to meet further, stating their belief that any future discussion would, given the Union's attitude, be futile. Two weeks after the final meeting with the Union, on July 1, 1975, Checker and Yellow both commenced their leasing operations.
 
 B.) The Leasing Programs
 
 9
 In the course of establishing its leasing operation the Companies transferred no driver from a commission to a lease system other than at his own request, and there is no evidence that they even solicited drivers to become lessees.[10] The terms of the lease itself are straightforward. Leases are given on a day, night or twenty-four hour basis and the driver must post a bond to cover any damage that he may do to the car during its operation.[11] The terms of the lease agreement state that the Company is not required to renew or extend any lease and that it can terminate a lease and repossess the car involved for any violation of a government ordinance or regulation. It also provides explicitly that the driver is a lessee and not an employee, is not required to report his location, complete a trip sheet recording his rides and fares, account for his collections, or maintain his cab in any specific place. The lease contains a prohibition on subleasing and imposes a total mileage limit calculated to ensure that subleasing does not take place of 250 miles in any twenty-four hour period.
 
 
 10
 There is no question that even though the lease agreements by their explicit terms do not directly regulate the lessee-drivers, they do require compliance with the provisions of all applicable laws and regulations and lessees may be terminated for violation thereof. The drivers' conduct is in fact fairly closely controlled by the local ordinances. The municipal regulations are multitudinous. They not only require the cab driver to pass a series of medical, geographical and driving tests, but also to run his meter properly, to present a neat appearance, and to use cab stands and the large ranks at O'Hare Airport in a certain prescribed manner. In sum, "the regulations . . . cover numerous aspects of the drivers' work which, in a different context, might normally be dealt with by the drivers' employer."[12] The fundamental difference between commission and lessee drivers, both of whom are subject to the same municipal regulations, is that the former work for the companies and are accountable to them for all sums collected as fares, from which they receive a stated portion as their earnings, while the latter lease their cabs, pay only a single flat rate and work for themselves.
 
 
 11
 The Union charged that the Companies were guilty of unfair labor practices by instituting the leasing program without consulting the Union and by refusing to recognize it as the bargaining representative for the lessee drivers. The Administrative Law Judge found that on the basis of recent NLRB decisions the lessees were not employees and that the Union itself had made bargaining impossible by adopting an adamant opposition to leasing and by refusing to negotiate unless it was first recognized as the bargaining representative for the lessee drivers. The Union was not entitled to assume this position unless it was so selected by the drivers in an election.[13]
 
 
 12
 The NLRB reversed the Administrative Law Judge on both these issues.[14] The Board held that the cab companies exercised sufficient control over the lessee drivers that an employer/employee relationship existed[15] and that the Union's refusal to bargain before it was recognized was immaterial in light of the Companies' firm resolution to begin leasing operations regardless of the union's position.[16] We find ourselves in agreement with the Administrative Law Judge, and accordingly deny enforcement of the Board's order insofar as it is inconsistent with that examiner's conclusions.
 
 II. STANDARD OF REVIEW
 
 13
 Before reaching an analysis of the merits of the petitions before us it is appropriate to point out why in this particular case little deference is due to the Board's decision.[17] The Board's treatment throughout the years of the distinction between "employees" and "independent contractors" in the area of vehicular, and especially cab, leasing has been marked by an unusual degree of confusion and vacillation. The Act covers "employees" but not "independent contractors" by virtue of an express statutory provision: "The term 'employee' . . . shall not include . . . any individual having the status of an independent contractor . . . " 29 U.S.C. § 152(3). As discussed below,[18] the criteria for distinguishing between these two types of workers is based on an "all of the circumstances" test. Given such a standard, one would expect a somewhat irregular, case-by-case approach to elaborating the controlling distinctions. The Board, however, has surpassed itself in clouding what need not have been an unusually confusing development of the law. Not only has the NLRB repeatedly reached diametrically opposite conclusions on the basis of virtually identical fact situations, Compare Checker Cab Company and its Members, 141 NLRB 583, 588-590 (1963); 153 NLRB 651 (1965), Aff'd 367 F.2d 692 (6th Cir. 1966); Blue Cab Company and Village Cab Company, 156 NLRB 489 (1965); Association of Independent Taxicab Operators, Inc., T/A Diamond Cab, 164 NLRB 859 (1967); John Himmer Transfer, Inc., 221 NLRB 52 (1975) and Local 814, I.B.T. (Santini Brothers), 223 NLRB 752 (1976); Greater Houston Transportation Company d/b/a Yellow Cab Company, 208 NLRB 1020 (1974); Barwood, Inc., 209 NLRB 19 (1974); Columbus Green Cabs, Inc., 214 NLRB 751 (1974), but moreover, it has done so in a series of opinions which typically offer no explanation for their result other than a recitation of the pertinent facts, E. g., Greater Houston Transportation Company and All other Employees d/b/a Yellow Cab Company, supra, 208 NLRB at 1022 ("In our opinion, these facts conclusively show (that the lessee drivers are independent contractors)"); Columbus Green Cabs, supra, 214 NLRB at 752 ("Based on the entire record, we conclude (that the lessee drivers are independent contractors)").[19]
 
 
 14
 This process of ad hoc and inconsistent judgments in which the only determinative elements seems to be the composition of the NLRB panel which happens to hear the case[20] has descended in the instant case almost to the point of absurdity. Yellow and Checker Cabs not only took into account their own legal analysis of the most recent NLRB opinion on the subject, Columbus Green Cabs, supra, but also in formulating their leasing plan actually consulted with other cab companies whose leasing programs had been held by the Board to create independent contractors rather than employee drivers. Nevertheless, the Board has now determined, seeking to dismiss Columbus Green Cabs as an aberration,[21] that the Companies' drivers are in fact employees because "in regard to Columbus Green Cabs, Inc. suffice it to say that it and similar cases must be narrowly construed in order that employees not be denied the protection of the Act through an undue extension of independent contractor status."[22]
 
 
 15
 The vacillation of the NLRB in regard to the question of the status of cab leasing makes an attitude of judicial deference to its decision especially inappropriate. The Board cannot, despite its broad discretion, arbitrarily treat similar situations dissimilarly, E. g., Carnation Company v. NLRB, 429 F.2d 1130 (9th Cir. 1970); Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); NLRB v. WGOK, Inc., 384 F.2d 500 (5th Cir. 1967); Burinskas v. NLRB, 123 U.S.App.D.C. 143, 357 F.2d 822 (1966). When it both fails to distinguish contradictory decisions rendered in similar cases and also misapplies accepted principles of law, it errs doubly, NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). An agency in its deliberations is under an obligation to follow, distinguish, or overrule its own precedent, Brown v. NLRB, 462 F.2d 699 (9th Cir.), Cert. denied, 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972); May Department Stores Co. v. NLRB, 454 F.2d 148 (9th Cir.), Cert. denied, 409 U.S. 888, 93 S.Ct. 116, 34 L.Ed.2d 144 (1972); Carnation Co. v. NLRB, supra. The NLRB has clearly failed to discharge this obligation here, and its actions indicate that lack of reasoned articulation and responsibility that vitiates the deference we would otherwise show to its very considerable expertise in strictly labor matters. NLRB v. Madison Courier, Inc., 153 U.S.App.D.C. 232, 472 F.2d 1307 (1972); Office and Professional Employees International Union, Local 425, AFL-CIO v. NLRB, 136 U.S.App.D.C. 12, 419 F.2d 314 (1969).
 
 
 16
 The issues here are not peculiarly confined to labor matters. While the Board does have a great many cases that involve this same question so do the state and federal courts generally and a number of other agencies. Basically the issue involved calls for applying general principles of the law of agency the distinction between employees and independent contractors to undisputed facts. On such an issue we must affirm the administrative decision only if it is supported by the record considered as a whole, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Brown v. NLRB, supra. Since the problem is essentially the interpretation of the common law in which the courts themselves are expert, See Davis, Administrative Law § 30.09 (1957) we need not accord the Board's decision that special credence which we normally show[23] merely because it represents the agency's considered judgment.
 
 
 17
 In sum, because of the Board's history of vacillation and the basically legal nature of the question before us, it is inappropriate for this court to extend any great amount of deference to the Board's disposition of the problem of whether or not Yellow and Checker's lessee-drivers are employees or independent contractors.
 
 III. THE STATUS OF THE LESSEE DRIVERS
 A.) The Board's Analysis
 
 18
 Under the right-of-control test which the NLRB and numerous courts have adopted for distinguishing between employees and independent contractors for purposes of the NLRB, the Board is instructed to apply the same general agency principles as would the courts in determining whether or not an individual is an employee or an independent contractor, Lodge 1858 v. Webb, 188 U.S.App.D.C. 233 at 242, 580 F.2d 496 at 505, n. 25 (1978); NLRB v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); See also Brown v. NLRB, supra; NLRB v. Lindsay Newspapers, Inc.,, 315 F.2d 709 (5th Cir. 1963); News Syndicate Co., Inc., 164 NLRB 422 (1967); Kheel Labor Law § 14.04(1)e (1978); Werne, The Law of Labor Relations 63 (1951).[24] Although this test essentially requires an "all of the circumstances" approach and no one factor is determinative, E. g., Frito-Lay, Inc. v. NLRB, 385 F.2d 180, 187 (7th Cir. 1967); NLRB v. A. S. Abell Co., 327 F.2d 1, 4 (4th Cir. 1964); News Syndicate Co., Inc., supra, the extent of the actual Supervision exercised by a putative employer over the "means and manner" of the workers' performance is the most important element to be considered in determining whether or not one is dealing with independent contractors or employees, Lodge 1858 v. Webb, supra, 188 U.S.App.D.C. 233, 241-245, 580 F.2d at 504-508; Carnation Co. v. NLRB, supra; Independent Owner-Operators, Inc. v. NLRB, 407 F.2d 1383, 1385 (9th Cir. 1969); NLRB v. A. S. Abell Co., supra, 327 F.2d at 3; New York University, 205 NLRB 4 (1973); 4 Kheel, Labor Law § 14.04(1)e. As the NLRB has stated,
 
 
 19
 Where the person for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished the relationship is one of employment; but where control is reserved only as to the final result the relationship is that of an independent contractor.
 
 
 20
 Checker Cab Co. and its Members, 141 NLRB 583, 587 (1963). In the case of cab drivers, the control over the "manner and means" of performance has specifically been limited for purposes of distinguishing between employees and independent contractors to that "control which . . . the (cab company) exercised over the drivers during the period they were in possession of the cabs," Party Cabs Co. v. United States, 172 F.2d 87, 92 (7th Cir.), Cert. denied, 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949).
 
 
 21
 The NLRB in this case, much as in previous decisions in which it has found cab lessees to be employees, E. g., Checker Cab Ass'n, 185 NLRB 182 (1970); Buffalo Cab Co., 189 NLRB 410 (1971), identified some thirteen factors indicating that Checker exerted a control over its drivers inconsistent with its assertion that they should be considered independent contractors.[25] While acknowledging that the cab companies have substituted "economic controls" for the more usual forms of direct control typical of an employer/employee relationship, the Board echoed the dissent in several recent NLRB opinions stating that to hold cab-lessees to be independent contractors and to overlook the drivers' lack of any meaningful independence from Checker or Yellow would be "to ignore economic realities."[26]
 
 
 22
 The Board, although it did not articulate any reason for doing so, laid particular emphasis on the facts that the drivers had no investment in their cabs; that the leases offered were of extremely short duration; that the Companies had complete discretion to refuse renewal of these leases; and that by requiring that their drivers comply with the host of applicable municipal regulations the Companies in fact were able to control a great deal of the drivers' behavior while in the cab.[27] While conceding that the drivers when operating their cabs under lease were "on their own and are free to prospect for fares when and where they choose,"[28] the Board dismissed this freedom as it had in Checker Cab Ass'n, Inc., supra, as being "inherent in the nature of the work" rather than indicative of independent contractor status.[29] While acknowledging that a number of recent NLRB cases had found taxicab lessees to be independent contractors rather than employees, the Board remarked that it was significant that none of these cases had explicitly overruled previous Board authority to the contrary,[30] and asserted that it was important to limit the holding of the more recent cases narrowly to their specific facts.
 
 
 23
 We share the Board's solicitude to avoid depriving Employees of the benefits of the Act by Unjustifiably expanding the concept of "independent contractor." We feel, however, that the Board in distinguishing between employees and independent contractors has failed to do so in any reasonable or consistent pattern and moreover has tended to rely on a variety of factors some of which are of only marginal relevance while glossing over the fundamental question of whether or not the putative employer has the right to control the driver during the course of his operation of the cab in the manner and means in which he earns his income and whether the drivers can be most aptly described as working for themselves or for a wage they receive from companies.
 
 
 24
 "( T)he employer-employee relationship exists only where the person, for whom the work is done, has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished . . . (I)t is the right and not the exercise of control which is the determining element." Williams v. United States, 126 F.2d 129 (7th Cir.), Cert. denied, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527 (1942); Carnation Co. v. NLRB, supra, 429 F.2d at 1134. Control exercised over the "manner and means of performance," NLRB v. A. S. Abell Co., supra, 327 F.2d at 3, not merely the economic controls which many corporations are able to exercise over independent contractors with whom they contract, Carnation Co. v. NLRB, supra, 429 F.2d at 1134, is the identifying characteristic of an employer/employee relationship.
 
 
 25
 The Restatement (Second) of Agency in listing factors relevant to distinguishing between employees and independent contractors refers to "the extent of control which, by the agreement, the master may exercise over the Details of the work" Restatement (Second) of Agency § 220 at 485 (emphasis added).[31] The reference to "details" indicates the extent to which the supervision typical in employment relationships regulates the actual activities undertaken by the employee in the course of his occupation rather than merely the general objective or context of this work. See Associate Independent Owners-Operators, Inc. v. NLRB, supra, 407 F.2d at 1385; National Freight, Inc., 146 NLRB 144 (1964). "The right to control the physical movements of the employee is the most important single element in most of these (employment as opposed to independent contracting) situations," Seavey, Agency 142 (1964).
 
 
 26
 In the instant case, there is virtually no control imposed by Yellow or Checker over the lessee-drivers, independent of municipal regulations, which are themselves beyond the companies' control. Certainly such company regulation as does exist does not so "overshadow considerations of the worker's right to assert his own prerogatives" that an employment relationship can be said to exist, Kheel, Supra at 14-139. Once a driver leases a cab, Checker and Yellow not only do not assert, but have no interest in asserting, control over his conduct, except to ensure that the cab is not sub-leased and the companies' liability is not enlarged.
 
 
 27
 As for the Board's argument that the extensive regulation of taxi-drivers by municipal ordinance de facto gives the companies control over the drivers' conduct on the job, the NLRB's position is not only inconsistent with precedent, but also evinces a misunderstanding of the effect of state regulation on the nature of the employer-employee relationship. The Administrative Law Judge pointed out that not only is extensive municipal regulation typical of the cab business in most metropolises,[32] but also such regulation had been present in a number of cases in which the Board found that the drivers were independent contractors.[33] Furthermore, regardless of whether or not the Board has dealt with the presence of municipal regulations consistently, in terms of substantive principle the existence of legal restrictions on the performance of an occupation are relevant but not necessarily controlling on the question of whether or not a given individual is an employee or an independent contractor.
 
 
 28
 Government regulations constitute supervision not by the employer but by the state.[34] Thus, to the extent that the government regulation of a particular occupation is more extensive, the control by a putative employer becomes less extensive because the employer cannot evade the law either and in requiring compliance with the law he is not controlling the driver. It is the law that controls the driver. Thus requiring drivers to obey the law is no more control by the lessor than would be a routine insistence upon the lawfulness of the conduct of those persons with whom one does business. The effect of state regulation is a far cry from such restrictions as cause "the actor's physical activities and his time (to be) surrendered to the control of the Master," Restatement (Second) of Agency § 220, comment at 487-488 (emphasis added). In the situation before us, whatever control is exercised is not the master's but that of the local government. That the state has chosen to so regulate cab drivers that those who lease cabs can be reasonably confident of the conduct of the drivers while in their cabs does not mean that the lessors thereby "control" this conduct. That government regulation has made supervision or control by the lessor unnecessary is not the equivalent of the presence of actual supervision or control. Looking at the "realities" of the situation, as the NLRB explicitly insists one must,[35] leads to the conclusion that to the extent that municipal ordinances prescribe the conduct of lessee drivers they are regulated by law, not supervised or controlled by Checker or Yellow and in this context it is significant that the lessor does not control, or have the right to control, the lessee in the performance of those functions that are free of local regulation.
 
 
 29
 The Board itself has noted that incorporation of government regulations into a contract does not alone establish an employer/employee relationship, Local 814, IBT (Santini Bros.), supra; Portage Transfer Co., Inc., 204 NLRB 787 (1973); Reisch Trucking and Transportation Co., Inc., 204 NLRB 953 (1963), and this view has been adopted in some courts, E. g., Sida of Hawaii, Inc. v. NLRB, 512 F.2d 354 (9th Cir. 1975). Indeed the NLRB stated only recently that it is only where "pervasive control" by the putative employer "(exceeds) governmental regulations to a significant degree" that employee status will be found, Teamsters Local 814, supra, 223 NLRB at 753; See also NLRB v. Deaton, Inc., 502 F.2d 1221 (5th Cir. 1974), Cert. denied, 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975); NLRB v. Cement Transport Inc., 490 F.2d 1024, 1027 (6th Cir.), Cert. denied, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); Ace Doran Hauling & Rigging Co. v. NLRB, 462 F.2d 190, 194 (6th Cir. 1972). In this case, far from exerting "pervasive control" in excess of municipal regulations, Checker and Yellow have required only such minimal measures as are normally used to protect themselves "from civil or criminal liability resulting from the operation of the cabs."[36]
 
 
 30
 It appears that the cab companies' chief method of controlling their drivers in the past has been through the use of a "trip sheet" on which the driver was required to record all his rides and on the basis of which his commission was calculated. The companies evidently are prepared to concede that if they still made use of trip sheets to force drivers to account for their income, their drivers should be considered employees.[37] Under the Companies' leasing plan, however, trip sheets are not required as they would serve no purpose. The driver who leases a cab is not required to produce any revenue and the company receives the same amount of money irrespective of the amount the driver receives. The absence of a trip sheet or any other means of holding drivers accountable for their income is a significant indication of the lack of company control over the drivers.[38]
 
 
 31
 The Union points out that the City of Chicago itself has recently promulgated a regulation requiring all cab-drivers to maintain a trip sheet whether or not they operate on a lease or commission basis.[39] This additional municipal regulation, however, no more changes the nature of the cab company/driver relationship than did any of the other regulations alluded to above. Although a lessee-driver now presumably must fill out much the same records as a commission cabbie, the company does not use these records to exert any financial control over the drivers. The formality is required by the ordinance, but this does not involve control by the company. It is not the simple fact of having to fill out a trip sheet, but the use made of that sheet by the employer which is relevant to the inquiry as to whether an individual is an employee or an independent contractor. In this case, the Companies make no use whatsoever of the trip sheets. They can be very useful in law enforcement and to that extent the city may legitimately require them. If they were required for other purposes the ordinance might be of doubtful validity.
 
 
 32
 As additional evidence of the control in fact exerted by Yellow and Checker over their drivers, the Board makes much of the short-term of the leases offered by the cab companies, the brevity of their duration creating the possibility of swift disciplinary action (by refusal to renew a lease) and keeping the drivers dependent on remaining in the good graces of the company. The length of the lease has been acknowledged as pertinent to the inquiry as to whether or not a lessee is sufficiently controlled by the lessor to be deemed an independent contractor, See, e. g., NLRB v. A. S. Abell, supra, 327 F.2d at 3, but this fact alone is not determinative of the issue, Cf. Frito-Lay Inc. v. NLRB, supra, 385 F.2d at 187. Even in the trucking field where the Board has appeared more reluctant to find independent contractors than among cab-lessees the right of the putative employer to terminate a driver on short notice has not proved fatal to the latter being found to be an independent contractor, Local 814, I.B.T. (Santini Brothers, Inc.), supra. The shortness of the lease term thus could be no more than one of many factors relevant to categorizing the drivers as employees or independent contractors.
 
 
 33
 Moreover, conceptually the length of the lease term does not reflect on the nature of the lessor/lessee relationship During the term of the lease. Regardless of how short the leases under which Yellow and Checker drivers operate may be, the fact remains that once they have obtained a lease they do not within limits designed to prevent subleasing[40] and to ensure compliance with the applicable laws have to account to the cab company for the operation of their cabs. Rather than working for and at the command of Yellow or Checker, the drivers essentially work for themselves and merely pay the companies for the service of providing the use of a cab and medallion. The companies for a price provide the instrumentalities of the drivers' livelihoods, and also reserve the right to review at short intervals whether or not they desire to continue to supply a given driver. Having done so, however, they do not supervise or control or, indeed, have much interest in, how the driver goes about his business of transporting persons for hire. The length of the lease term in no way affects this fundamental characteristic of the relationship between Yellow and Checker and their drivers while the latter are operating leased cabs.
 
 
 34
 The Board also remarked upon,[41] and the Restatement, Second, mentions,[42] the importance of a lack of investment in the instrumentalities of one's occupation as tending to indicate employee rather than independent contractor status. However much importance this factor should in general have in the determination of employee as opposed to independent contractor status, it does not support the Board's position here. Although the Board drew support from "the drivers hav(ing) no investment in the instrumentalities of their work," in fact, it appears that the Board has been deceived by the brevity of these agreements. To be sure, the amount paid for each day of leasing is not large $22 per day, $16 per night and $31 for a twenty-four hour lease[43] but when aggregated over a years' driving, it comprises a substantial investment on the part of the driver, amounting to somewhere in the neighborhood of $7,000.00.[44]
 
 
 35
 The drivers do not acquire any equity interest in the cars they drive, but in this respect they are no different from a shopkeeper who rents commercial space. The leasehold interest of the drivers is as legitimate a property right as the title retained by Yellow and Checker and is equally the product of an investment by the drivers, See generally I American Law of Property Chapter 2 (Casner ed. 1952).
 
 
 36
 The extent to which the lessee-drivers do indeed have a legitimate investment in their cabs is accented by a comparison between this case and situations in which an undoubted employer/employee relationship exists. In the usual employment relationship, the employer not only owns the instrumentalities of labor, but also supplies them free of charge to the worker. Rather than leasing out tools so that the "employees" can pursue Their chosen ends, the typical employer hires the employees to operate his machines in order to accomplish His chosen ends. The relationship of leasing drivers to their cabs is radically different from that of the ordinary employee using or operating his employer's tools. The lessee uses the instruments which he leases to produce as much income for himself as possible; the latter merely collects a wage for operating instrumentalities to produce wealth for his employer.
 
 B.) The Dispositive Factors
 
 37
 It would be unjustifiable to claim that the NLRB was incorrect in claiming that the cab-lessees in question did not have some of the characteristics of employees. These characteristics,[45] however, are of only minor importance compared with the crucial factors that go to determine whether or not cab companies have such control over their lessee-drivers that these drivers should be considered employees rather than independent contractors. When a driver pays a fixed rental, regardless of his earnings on a particular day, and when he retains all the fares he collects without having to account to the company in any way, there is a strong inference that the cab company involved does not exert control over "the means and manner" of his performance. This conclusion is justified because under such circumstances, the company simply would have no financial incentive to exert control over its drivers, other than such as is necessary to immunize the proprietor of a cab from liability which arises from its operation by virtue of the lessor's ownership. However the driver conducts his occupation, the company has received its financial reward and the cab driver's self interest in the success of his venture and the municipal regulations are some assurance that the cab service will continue to be attractive to customers.
 
 
 38
 Not only do cab companies have no financial incentive to impose controls on their lessee-drivers, but also it would be anomalous for them to try to do so. This is true because one of the motivations behind the institution of leasing was an attempt to enable the companies to be less involved in the routine difficulties of directing the daily operation of their cabs.[46] Moreover, to the extent that the companies' assertion of control would likely be resented by potential drivers, to the extent that the company sought to assert such controls beyond those required to guard against liability, it would be acting against its own best interests. In sum, once financial accountability is no longer important, Yellow or Checker have little business justification for seeking to continue to hold their drivers accountable in other matters.
 
 
 39
 The surrender of the right to make the drivers account for their earning causes a fundamental change in the relationship between the companies and their drivers which will usually remove the latter from the category of "employees." Even though the appearance of the leased cabs might be identical to that of commission cabs, such similarity of appearance has elsewhere been dismissed as unimportant, See Sida of Hawaii, Inc. v. United States, supra; Greater Houston Transportation Co. and all Other Employees d/b/a Yellow Cab Company, supra. Furthermore, the economic realities of the commission and leasing operations are quite different. The Court of Claims, in the context of another statute but in the course of applying the same common law principles explicitly embraced by the Act[47] has succinctly stated the nature of this difference:
 
 
 40
 . . . There (under a leasing rather than a commission system), each taxicab driver rented a taxicab from the owner at a flat daily rental; the driver also defrayed the principal expense involved in the operation of the taxicab (i. e. the cost of the gasoline in both cases, and also the cost of the oil in Party Cab Co.); and the driver kept all the fares that he was able to earn through the operation of the taxicab. Thus, each driver was, in essence, a small businessman, either making a profit of sustaining a loss on his activities, depending on the relationship between the total amount of the fares collected, on the one hand, and the total amount of the expenses incurred, on the other hand.
 
 
 41
 Morish v. United States, 555 F.2d 794 at 800 (1977); Cf. Penn Truck Painting and Lettering Corp., 215 NLRB 843 (1974).
 
 
 42
 When, as in the case of lessee cab drivers, an individual's labor does not benefit his lessor beyond the sum received for leasing equipment, it is stretching the traditional concept of "employee" to categorize such individuals as servants, I. e., employees. At the very least such lessees do not fit into the usual understanding of employees, and there is clear evidence that Congress did not intend that an unusually expansive meaning should be given to the term "employee" for the purpose of the Act. In 1947, the National Labor Relations Act was amended with the specific intent of overturning two then recent Supreme Court cases, United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) and NLRB v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). These decisions had broadly construed "employee" as used in the act.[48] Given the clear intent of the legislative history, we are not permitted to agree that lessee-drivers who are practically uncontrolled by the cab companies in the manner and means that they operate their cabs should be considered as "employees" within the scope of the NLRA.[49]
 
 
 43
 The Internal Revenue Service has ruled that if a cab lessee pays only a fixed rental for the cab and the company from which he leases does not require an accounting of its drivers' receipts, that the lessee will be considered an independent contractor, I.R.S. Rev. Ruling 71-572, C.B. 1971-2 p. 347. The I.R.S. ruling was rendered under the Internal Revenue code rather than the NLRA, and the Board is not compelled to follow that decision, E. g., Lorenz Scheider Co., 209 NLRB No. 16 (1974). On the other hand, in issuing its ruling the service explicitly applied the same "usual 'common law rules' applicable in determining the employer/employee relationship" that govern this case, Rev. Ruling 71-572, C.B. 1971-2 p. 34. In doing so, the IRS reasoned that one should look mainly to the presence Vel non of "controls" which are not economically beneficial to the lessee's interests in seeking to determine whether or not a true lessor/lessee relationship exists, as controls which are mutually beneficial to both the cab company (by making its cabs easier to lease) and the driver (by making cab leasing more profitable) are not "repugnant" to the existence of a valid leasing arrangement, See Las Vegas Sun, Inc., 219 N.L.R.B. 889 (1975).
 
 
 44
 Pursuing this line of analysis, the IRS found that the most important difference between employee cab drivers and lessee cab drivers to be the fact that the latter paid a fixed rate for their car and that their company "has no right to obtain, for its own benefit, an accounting with respect to the fares collected for operation of the taxicabs by either the owners or the lessees." Rev. Ruling 71-572, C.B. 1971-2 p. 34. This analysis mirrors our own, and we consider it to be a true statement of the law. There are two important elements here which determine that the lessee drivers are independent contractors and not employees. First, is the lack of control by the lessor in the manner and means in which the drivers carry on their business after they leave the garage. Second, is the fact that the compensation (rent) that the Company receives for the lease of the cab is not related to the amount of fares collected by the lessee-driver. Therefore the drivers must be considered independent contractors and beyond the reach of the Act.
 
 C.) The Possibility of Estoppel
 
 45
 Not only are the cab lessees in this case independent contractors for the reasons set forth above, but also, they are, as discussed above, in a virtually identical situation to those that the Board found to be independent contractors in Columbus Green Cabs, Inc., supra. This decision continued the movement begun in Greater Houston Transportation Co. and All Other Employees d/b/a Yellow Cab Company, supra and Barwood, Inc., supra, away from previous NLRB law, E. g., Checker Cab Ass'n, supra; Buffalo Cab Co., Inc., supra, which had held cab-lessees to be employees.
 
 
 46
 Had the Board continued the decisional pattern of earlier cases without embarking on the new course seen in the Barwood-Columbus Green Cabs line of cases,[50] its decision in this case would at least have had the merit of consistency. As it is, however, not only did the board indicate by the Barwood-Columbus Green Cabs authority that cab-lessees would be considered independent contractors, but moreover, Yellow and Checker also as mentioned above explicitly relied on these decisions in formulating their leasing plan.[51] In such circumstances, an element of estoppel enters this particular case.
 
 
 47
 Although an agency may change its policy as it determines is in the public interest, E. g., NLRB v. Wentworth Institute, 515 F.2d 550 (1st Cir. 1974) when, as here, it announces no principled reason for such a reversal, its action is arbitrary and the courts should be quick to so declare. We have previously held that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," Greater Boston T. V. Corp. v. FCC, 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852, Cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); International Union v. NLRB, 148 U.S.App.D.C. 305, 317, 459 F.2d 1329, 1341 (1972) ("It is an elementary tenet of administrative law that an agency must either conform to its own precedents or explain its departure from them"); Public Service Commission v. FPC, 167 U.S.App.D.C. 100, 115, 511 F.2d 338, 353 (1975); Garrett v. FCC, 168 U.S.App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975); See NLRB v. International Union of Operating Engineers, Local 925 AFL-CIO, 460 F.2d 589, 604 (5th Cir. 1972); NLRB v. Silver Bay Local Union, 498 F.2d 26 (9th Cir. 1974); See Atchison, T. & S. F. R. Co. v. Wichita Board of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). In this case, whether or not it would be proper actually to work an estoppel against the government, See generally, Davis Administrative Law in the Seventies 399-404 (1976), the vacillation of the Board's approach compels its demand. We deny enforcement of the Board's order because we are able to determine that the lessees in this case were independent contractors, but even were this not possible on the record before us, we would not grant enforcement without first having received from the Board an intelligible rationale for the distinctions they have drawn between employees and independent contractors.[52]
 
 
 48
 IV. THE DECISION TO LEASE AS A MANDATORY SUBJECT OF BARGAINING
 
 
 49
 The NLRB concedes that if cab-lessees are not employees, Yellow and Checker have not committed an unfair labor practice in instituting their leasing program.[53] The Union, however, advances the alternative argument that the decision to commence leasing was a mandatory subject of bargaining in that it affected the commission drivers' "wages, hours, and other terms and conditions of employment."[54] Thus, even if the companies were within their rights in not recognizing the Union as representative for the lessee-drivers, the Union contends that the companies nevertheless were guilty of an unfair labor practice by their unilateral creation of a leasing option.[55]
 
 
 50
 The companies' response to the Union's alternative theory is two-fold. They assert that there was no proof that the mere creation of an opportunity for those who desire to lease cabs to do so affected the "conditions of employment" of the commission drivers. Moreover, even if such an effect was demonstrated, Yellow and Checker argue that the decision to begin a leasing operation was not an unfair practice because it constituted a basic change in their corporate operation and thus was within their managerial discretion.[56] They also raise the additional defense even if the leasing decision was a mandatory subject of bargaining, that the Union itself was the party that refused to bargain by refusing to negotiate for the Commission employees unless the companies first recognized the Union as the representative of the lessee-drivers.
 
 
 51
 The Administrative Law Judge found that there was no evidence that the institution of leasing affected the conditions of employment of the commission drivers, but we feel that we must defer to the Board's expertise in this regard and concur in its rejection of this position. Despite the Union's inability to point to any specific decline in the commission drivers working terms, the Board's argument that any decision which virtually inevitably reduces the size and hence the strength of an employee-group's bargaining unit affects its conditions of employment seems persuasive.[57]
 
 
 52
 The fact that an employer's decision affects conditions of employment does not necessarily imply, however, that it is a mandatory subject of bargaining. The law draws a distinction between those decisions "primarily about the conditions of employment" which must be made a subject of bargaining and those which, while affecting the employees' working conditions, are entrepreneurial judgments "fundamental to the basic direction of a corporate enterprise" U.A.W. v. NLRB, 152 U.S.App.D.C. 274, 276, 470 F.2d 422, 424 (1972) or which substantially alter the way in which the business is conducted, Gorman, Labor Law 516, 521 (1976). The latter need not be submitted to bargaining.
 
 
 53
 At the same time that the law has been careful to insist on preserving the integrity of collective bargaining by mandating bargaining on certain issues, the courts have also been careful not to "significantly abridge (the management's) freedom to manage its own affairs." NLRB v. Adams Diary, 350 F.2d 108, 111 (8th Cir. 1965). "In each case the interests of the employees and the purpose of the National Labor Relations Act . . . must be carefully balanced against the right of an employer to run his business," International Ladies Garment Workers Union v. NLRB, 150 U.S.App.D.C. 71, 78, 463 F.2d 907, 916 (1972), Citing NLRB v. Royal Plating & Polishing Co., 350 F.2d 191, 195 (3d Cir. 1965); See Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 179, 92 S.Ct. 383, 30 L.Ed.2d 341 n. 19 (1971); Fibreboard Paper Products Co. v. NLRB, 379 U.S. 203, 218, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (Stewart, J. concurring). Accordingly, major shifts in the capital investment or corporate strategy of a company are not mandatory bargaining subjects, even though they may well have profound effects on the "conditions of employment," E. g., NLRB v. Drapery Mfg. Co., 425 F.2d 1026, 1028 (8th Cir. 1970); NLRB v. Transmarine Navigation Corp., 380 F.2d 933 (9th Cir. 1967). Indeed even when the change involved affects only a small, but not insubstantial portion of the employer's business operation, it may still be considered sufficiently "fundamental" to be within entrepreneurial discretion if the decision amounts to a business judgment based on economic considerations rather than an action motivated by antiunion animus, NLRB v. Johnson, 368 F.2d 549 (9th Cir. 1966); NLRB v. American Mfg. Co., 351 F.2d 74 (5th Cir. 1965).
 
 
 54
 The leading case concerning what is and what is not to be considered so fundamental a change as to lie outside the scope of mandatory bargaining is Fibreboard Paper Products Co. v. NLRB, supra. The ambiguity of this opinion is reflected by the fact that both parties in this, as well as other cases, cite the decision in support of their mutually contradictory positions, E. g., UAW v. NLRB, supra, 152 U.S.App.D.C. at 276, 470 F.2d at 424. In Fibreboard, the Supreme Court decided that when a company replaced its current maintenance employees with those of an independent contractor by contracting out the work involved, it must bargain concerning its decision to do so. The court, emphasized that the "decision to contract out maintenance work did not alter the Company's basic operation" and that the employees of the independent contractor were engaged "to do the same work under similar conditions of employment" as the employees whom they replaced, 379 U.S. at 213, 215, 85 S.Ct. at 405. Moreover, the opinion specifically mentioned that its holding "need not and does not encompass other forms of contracting out or 'subcontracting' which arise daily in our complex economy," 379 U.S. at 215, 85 S.Ct. at 405.
 
 
 55
 The precise scope of the Fibreboard decision is unclear, See 5 Kheel, Labor Law 20-175, and the Courts of Appeals have applied a case-by-case approach to delineating what decisions are beyond the scope of compulsory bargaining, U.A.W. v. NLRB, supra, 152 U.S.App.D.C. at 276, 470 F.2d at 424. Given the ambiguity of Fibreboard and the "all of the circumstances" test the courts have adopted, it is difficult to say that any managerial decision short of absolute termination is obviously within the employer's discretion, but the factual difference between what took place in Fibreboard and the conduct of Yellow and Checker strongly suggests that the result in Fibreboard is not appropriate here.
 
 
 56
 The Fibreboard company essentially only replaced more expensive union labor with more economical outside workers. By no stretch of the imagination could it be said that the company underwent any basic change in its operations. In the case of Yellow and Checker, on the other hand, the entire point of the companies' going into leasing was significantly to alter what had become a low profit operation.
 
 
 57
 The institution of leasing in this case differs markedly from the usual case of subcontracting. The issue here might be much closer had Yellow and Checker merely subcontracted out their commission driving work to some chauffeur agency, E. g., U.A.W. v. NLRB, 127 U.S.App.D.C. 97, 381 F.2d 265, Cert. denied, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967); Winn-Dixie Stores, Inc. v. NLRB, 361 F.2d 512 (5th Cir. 1967), Cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1968); Torrington Construction Co., 198 NLRB 1158 (1972); Westinghouse Electric Corp., 150 NLRB 1574 (1965). However, to the contrary, the decision to lease did not merely change the identity of the persons employed, but rather the entire basis of the companies' income. Although the Board places great emphasis on how similar lessee drivers and commission drivers appear to the members of the general public, the simple fact of the financial exigencies that led the cab companies to offer a leasing option indicate that their relationship to the company itself is as discussed above significantly different from that of commission drivers, and that the decision to initiate a leasing program constituted a fundamental corporate change, See N.L.R.B. v. Dixie Ohio Express Co., 409 F.2d 10 (6th Cir. 1969); Compare U.A.W. v. N.L.R.B., supra ; Weltronic Co. v. N.L.R.B., 419 F.2d 1120 (6th Cir. 1969), Cert. denied, 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970).
 
 
 58
 By moving into cab leasing, Yellow and Checker ceased to be concerned directly with the profitability of the transportation of persons for hire and instead assumed a position analagous to that of a car or truck rental firm.[58] This alteration in the underlying nature of the business of the companies was unquestionably a change in the "basic direction of the corporate enterprise," See 5 Kheel, Labor Law 20-101, and when such changes are motivated by economic considerations there is no duty to bargain concerning them. UAW v. NLRB, supra; NLRB v. Drapery Mfg. Co., supra, 425 F.2d at 1028.
 
 
 59
 The instant case is similar in many respects to the decision in NLRB v. Adams Dairy, Inc., supra. In that case the Eighth Circuit reaffirmed in the light of Fibreboard[59] its holding that a company's decision to abandon its own distribution service and rely on independent contractors was not a mandatory subject of bargaining. The court stated:
 
 
 60
 In Adams Dairy, on the other hand, a basic operational change did take place when the dairy decided to completely change its existing distribution system by selling its products to independent contractors. . . . The work done by the independent contractors, contrary to the situation in Fibreboard, was not primarily performed in the Adams plant for the benefit of the dairy. Adams was not directly concerned with whether or not any given distributor sustained a profit or loss, as would have been the situation with the driver-salesmen. The only major restrictions that Adams placed upon the independent distributors by contract related to sanitation matters and to the maintenance of high products standards and the maintenance of good will.
 
 
 61
 Contrary to the situation in Fibreboard, then, there is more involved in Adams Dairy than just the substitution of one set of employees for another. In Adams Dairy there is a change in basic operating procedure . . .
 
 
 62
 350 F.2d at 111.
 
 
 63
 Just as Adams Dairy no longer was concerned with the success of its independent distributors, Yellow and Checker are no longer concerned with the success of their lessees. In both instances a change was made in "basic operating procedure."
 
 
 64
 As in other areas of labor law, E. g., American Ship Building v. NLRB, 380 U.S. 300, 308-309, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) the factor of anti-union animus is germane to the determination of whether a proposed change in a company's operations is a mandatory subject of bargaining, UAW v. NLRB, supra; NLRB v. Johnson, supra; NLRB v. American Mfg. Co., supra, Gorman, Labor Law 515. In this case there was no proof whatsoever that Yellow and Checker were led into leasing by antiunion animus. Indeed, the prevalence across the nation of newly inaugurated cab-leasing programs[60] is some indication that Yellow and Checker in adopting such a program were not motivated by hostility towards their particular union, but rather by recognition of the changing economics of operating taxi-fleets. The obviously compelling nature of the financial justifications for switching to a leasing operation forces a heavy burden of persuasion on anyone seeking to argue that other reasons were in fact at the root of the companies' decision. Neither the Union nor the NLRB has made anything like the requisite showing on this point.
 
 
 65
 Just as there is no indication that the companies acted from any anti-union animus, there is no reason to suppose that their purpose was merely to replace one set of employees with another an action which obviously would be a mandatory subject of bargaining, Fibreboard Paper Products Co. v. NLRB, supra; NLRB v. Kelly & Picerne, Inc., 298 F.2d 895 (1st Cir. 1962). On the contrary, the focus of their leasing program was not on personnel at all but on the financial structure of the business. The evidence was uncontroverted that the decision to begin leasing was motivated by economic reasons.[61] Courts have traditionally been reluctant to require employers to bargain about such decisions, See, e. g., NLRB v. Neiderman, 334 F.2d 601, 604 (2d Cir. 1964); Jays Foods, Inc. v. NLRB, 292 F.2d 317 (7th Cir. 1961), Cert. denied, 379 U.S. 969, 85 S.Ct. 663, 13 L.Ed.2d 561 (1965)[62] even when one is dealing with the usual forms of subcontracting which often do little to alter the basic operation of an enterprise and rarely approach changing the basic nature of a corporation's income to the extent that the institution of leasing affected Yellow and Checker's, See NLRB v. Rives Co., 288 F.2d 511 (5th Cir. 1961); NLRB v. Lassing, 284 F.2d 781 (6th Cir. 1960), Cert. denied, 366 U.S. 909, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961); 5 Kheel 20-70.
 
 
 66
 In light of the above analysis, it is highly probable we would decide that the decision to lease cabs was not a mandatory subject of bargaining. However, we cannot ignore the fact that determining which decisions affect "conditions of employment" and which of those that do constitute "fundamental corporate changes" is a procedure inevitably wrapped in some ambiguity, Compare Adams Dairy, supra, and Ozark Trailers, Inc., 161 NLRB 561, 565-570 (1966); Cf. I.L.G.W.U. v. NLRB, supra; United Electrical Radio and Machine Workers v. NLRB, 133 U.S.App.D.C. 115, 121, 409 F.2d 150, 156 (D.C. Cir. 1969); 5 Kheel, Labor Law 20-175. Accordingly, we prefer to rest our decision on the grounds that even if the decision to institute leasing was a mandatory subject of bargaining, the companies' unilateral action was not an unfair labor practice because the union itself made any negotiation impossible by imposing an improper condition as a prerequisite to bargaining.
 
 
 67
 The findings of the Administrative Law Judge, unchallenged by the Board, are sufficient testimony of the Union's preclusion of bargaining:As the lessees were nonemployees, the Union's demand was a nonmandatory subject of bargaining, if not improper, and the Companies were warranted in breaking off their discussions at this point. Therefore it cannot be found that the Companies acted unlawfully by unilaterally instituting leasing. The Union was given notice of the Companies' intention to go into leasing, and an opportunity to discuss the matter and bargain about its impact on the commission drivers, but the Union rejected the opportunity for such bargaining. ([63]
 
 
 68
 The Board argued that even though the Union's demand to be recognized as the bargaining agent for the cab-lessees prevented bargaining, this action was "immaterial" in view of the Companies' "preordained refusal to bargain about the decision to lease."[64] What the Board failed to recognize was that the companies' attitude was itself in large part provoked by the Union's outspoken and unwavering rejection of cab leasing.
 
 
 69
 The Union did not directly respond to Yellow about the matter (leasing proposals) . . . Instead, the Union flexed its political muscles. At a meeting of the Chicago Federation of Labor on May 5, Union President Clark informed the press that the Union was opposed to leasing, accused the Companies of engaging in union-busting tactics by setting up Bell and Comet (subsidiaries through which Yellow and Checker initially had planned to lease a number of their cabs), and implied that the drivers might strike. In late May, Commissioner Carter informed Yellow that he would not approve transfer of the license; and, in fact, Yellow's application has never been acted upon. ([65]
 
 
 70
 In the face of such overt hostility by the Union, there could be no reasonable expectation of real negotiation on the subject of leasing.[66] Indeed, set against this background, the fact that the companies informed the union that they were considering leasing and "invited discussion Before their final decision"[67] (emphasis added) evinces a greater commitment on their part to the collective bargaining process than was reflected by the Union.[68] When, in addition to its vitriolic attacks on leasing, the Union proceeded to refuse to engage in any negotiations despite the companies' explicit invitation to do so until it was recognized as the bargaining agent for the lessee drivers, it is hard to see what options Yellow and Checker had left other than to initiate their leasing program. It would make a mockery of the labor law for this court to hold that The Company had committed an unfair labor practice by refusing to bargain when the Union gave a public demonstration of its intransigent opposition to a management proposal, attempted to thwart the realization of this proposal by political action, and conditioned any bargaining on an illegal recognition of it as collective bargaining representative. To uphold such conduct would be a distortion rather than a vindication of the Act, See NLRB v. Kelly Bros. Nurseries, Inc., 341 F.2d 433 (2d Cir. 1965); NLRB v. Tex-Tan, Inc., 318 F.2d 472 (5th Cir. 1963).[69]
 
 
 71
 V. THE UNILATERAL IMPOSITION OF A CAB "TAKE-HOME" FEE
 
 
 72
 An additional point, having nothing to do with the leasing problem, concerns the companies' unilateral imposition of a $10 per week charge to commission drivers for the privilege of taking their cabs home with them at night.
 
 
 73
 In January and February of 1975, some six months before the beginning of their leasing operations, the companies decided that their rule prohibiting overnight privileges was impossible to enforce and instead of prohibiting the practice altogether elected to impose a take-home charge. In doing so, it made no attempt to consult with the Union.
 
 
 74
 The Companies do not address in their briefs the question of whether or not failing to bargain concerning the imposition of a take-home charge was an unfair labor practice,[70] nor did Checker except to this finding before the Administrative Law Judge.[71] Accordingly, they may be deemed either to have conceded that the Board's determination that they committed an unfair labor practice was justified or to be barred on procedural grounds from here challenging this decision. Whether or not one or both of these arguments for dismissing the companies' petition to review this aspect of the Board's order has merit, it is clear they did indeed commit an unfair labor practice by not bargaining concerning take-home charges.
 
 
 75
 There appears to be some dispute as to whether or not it had been the established custom of the companies to allow drivers to take their cabs home at night,[72] however, whatever the past practice may have been, the imposition of unprecedented take-home fees was a change from such practice, and thus was a mandatory bargaining subject because it affected the drivers' conditions of employment, See United Electrical Radio and Machine Workers of America v. NLRB, 133 U.S.App.D.C. 115, 409 F.2d 150 (1969); NLRB v. Detroit Resilient Floor Decorators Local 2265, 317 F.2d 269, 270 (6th Cir. 1963) ("All emoluments of value or other benefits accruing to employees out of their relationship with their employer" are mandatory subjects of bargaining.).
 
 
 76
 Leasing fees for company houses have consistently been held to be a mandatory subject of bargaining, E. g., NLRB v. Lehigh Portland Cement Co., 205 F.2d 821 (4th Cir. 1953), enforcing 101 NLRB 529 (1952); NLRB v. Hart Cotton Mills, Inc., 190 F.2d 964 (4th Cir. 1951); American Smelting and Refining Co. v. NLRB, 406 F.2d 552 (9th Cir.), Cert. denied, 395 U.S. 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969), and leasing fees for company cars seems only marginally different.[73] In fact, a change in policy governing the right to take a company car home at night has specifically been held to be a mandatory subject of bargaining, particularly where, as here, those granted the privilege are thereby enabled to earn additional income,[74] See Wil-Kil Pest Control Co. v. NLRB, 440 F.2d 371, 374-375 (7th Cir. 1971).
 
 
 77
 There can be no question that an employer violates section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5)[75], by unilaterally changing the conditions of employment without giving the union an opportunity to negotiate concerning the change, NLRB v. Katz, 369 U.S. 739, 743, 747-748, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. C & C Plywood Corp., 385 U.S. 421, 424-425, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), regardless of what the employer's motives in instituting such a change may have been, NLRB v. Katz, supra, 369 U.S. at 742-743, 82 S.Ct. 1107.[76] We see no basis for disputing the Board's decision that the actions of Yellow and Checker in this respect amounted to unfair labor practices. Obviously, however, in requiring the Companies to bargain concerning the imposition of the take-home fees, we do not suggest that they cannot impose such charges, but only that they must negotiate in good faith with the Union before doing so,[77] See, e. g., NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952); NLRB v. McLane Co., 405 F.2d 483 (5th Cir. 1968); NLRB v. American Compress Warehouse Division of Frost-Whited Co., 350 F.2d 365 (5th Cir. 1965), Cert. denied, 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472 (1966); Radiator Specialty Co. v. NLRB, 336 F.2d 495 (4th Cir. 1964).
 
 VI. THE BOARD'S REMEDY
 
 78
 The final question presented here concerns the appropriateness of the remedy ordered by the Board. The Union submits that as the imposition of the take-home fee without bargaining was an unfair labor practice the Companies should reimburse all those who had paid that fee.[78] The Board refused to order such relief on the grounds that no showing had been made that the drivers who had paid the ten dollar fee had been injured by doing so.[79] Although there was testimony that some drivers were allowed to take their cabs home at night before the companies instituted the take-home charges,[80] most of them were prohibited from doing so.[81] Thus, many of those who paid the $10 fee may in fact have been making a profit in doing so, depending on how many additional fares they could obtain while driving to and from their homes.[82]
 
 
 79
 In such circumstances of ambiguous injury, it was clearly within the Board's discretion to decline to order reimbursement. Not only is the Board directed by the Act to impose only remedial, not punitive relief, See Local 60, United Brotherhood of Carpenters v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953), but also it is well settled that the Board's discretion in the selection of remedies is exceedingly broad, See NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1961); NLRB v. Gissel Packing Co., 395 U.S. 575, 612, 89 S.Ct. 1918, 23 L.Ed.2d 547 n.32 (1969); Fibreboard Paper Products Co. v. NLRB, supra, 379 U.S. at 216, 85 S.Ct. 398; Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943)[83]; United Steelworkers of America, AFL-CIO v. NLRB,141 U.S.App.D.C. 178, 179, 436 F.2d 908, 909 (1970) Cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); Amalgamated Clothing Workers v. NLRB, 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966). The Board's selection of remedies will not be disturbed absent a clear showing of abuse, and given the doubt as to whether there has in fact been any injury to be remedied we cannot hold that the Board abused its authority in denying reimbursement of the take-home fees that had been paid.
 
 
 80
 The Union's other challenge to the remedy imposed by the Board is vitiated by our finding that the companies did not commit an unfair labor practice in refusing to recognize the Union as representative of the lessee drivers, Yellow and Checker cannot be held liable to the union for those "dues and initiation fees which (the Union) certainly would have received"[84] had it been recognized as the representative of the lessee-drivers.
 
 
 81
 In accordance with the above analysis, we grant Yellow and Checker's petition to review in respect to its challenges to the Board's decision that the companies' lessee-drivers are employees and not independent contractors and that Yellow and Checker committed an unfair labor practice by refusing to bargain concerning their decision to institute leasing. We deny the Union's petition for review of that part of the Board's order that refused its claim for "dues and initiation fees," "take-home fees" and "interest." We grant the NLRB's cross-application for enforcement only insofar as the Board found that the unilateral imposition of a cab take-home fee violated section 8(a)(5) and (1) of the Act and ordered its rescission.
 
 
 82
 So ordered.
 
 ON PETITION FOR REHEARING
 
 83
 Before TAMM and MacKINNON, Circuit Judges; and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 
 ORDER
 
 84
 PER CURIAM.
 
 
 85
 Upon consideration of respondent's petition for rehearing, and of the response filed thereto, it is
 
 
 86
 ORDERED, by the Court, that respondent's aforesaid petition for rehearing is denied for the reasons set forth in the opinion for the Court filed herein this date.
 
 
 87
 Opinion for the Court filed by MacKINNON, Circuit Judge.
 
 MacKINNON, Circuit Judge:
 
 88
 The Board and the Union (hereinafter "petitioners") petition for rehearing contending that the court must defer to the Board's decision that the lessee cab drivers were "employees" within the meaning of the Labor Act, and that the panel's failure to do so was "revolutionary."[1] Specifically, petitioners make the following arguments: (1) the panel exceeded the scope of its judicial authority by conducting a "De novo review" of the Board's decision; (2) "the Board's history of vacillation and the basically legal nature of the question"[2] should not reduce the amount of deference due the Board's determination; and (3) the panel ignored substantial evidence supporting the Board's finding that the lessee cab drivers are "employees" rather than "independent contractors." In addition, petitioners argue that the panel opinion is inconsistent with Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).[3] Since these arguments misinterpret both the panel opinion and the relevant decisional and statutory law, a response is appropriate.
 
 
 89
 * Petitioners describe the court's opinion as constituting a De novo review, and cite a number of cases which hold that courts should not engage in De novo review of administrative decisions. Of course, De novo review of the Board's decisions is ordinarily inappropriate,[4] and should not be indulged in "as an original matter."[5] The flaw in petitioners' argument is their assertion that the court's decision is a product of De novo review. It is not.
 
 
 90
 The term "do novo review" is often used loosely. Losing parties tend to apply it to unfavorable court decisions as an epithet. But actually, it has a rather precise meaning.
 
 
 91
 We must always be conscious of the distinction between a de novo trial, where the case is tried a second time and the record is made up in the district court, and a court's review of findings of an administrative body, where the record is solely that of the administrative body.
 
 
 92
 Globe-Union, Inc. v. Chicago Telephone Supply Co., 103 F.2d 722, 728 (7th Cir. 1939).[6]
 
 
 93
 In light of this definition, it is clear that the court did not engage in objectional De novo review. It did not re-examine the Board's findings of fact. Rather we considered whether the Uncontroverted facts, when they were applied to the settled law, were sufficient In law to warrant the Board's conclusion that the lessee drivers are employees rather than independent contractors. Following that standard the opinion pointed out that the Board's findings of fact did not support its Conclusion of law,[7] that the lessee drivers are employees. The defects in the ruling were set forth in considerable detail, and the Board's decision was therefore reversed.[8] In sum, while De novo review would have been improper, that rule is not relevant here because our decision is not a product of a De novo review. Rather it is a product of the responsibility placed on a court that reviews the action of an administrative agency to "fully review . . . administrative decisions." In our view the facts of record are insufficient to support a conclusion of law that the lessee cab drivers are employees, and, as we develop below, to so hold would violate the "statutory mandate" and the "congressional policy" underlying the statute.
 
 II
 This Court's opinion states:
 
 94
 195 U.S.App.D.C. at ---, 603 F.2d at 872. Petitioners acknowledge that there is some tension between the Board's early decisions holding lessee cab drivers are "employees" and its more recent decisions finding that lessees are "independent contractors."[9] The Board contends, however, that neither its vacillating record on this issue, nor the basically legal nature of the question, reduces the extent to which courts must defer to the Board. This argument substantially answers itself and we are not in any doubt that when an agency on a particular legal issue, without giving any Reasoned decision for changing, arrives at three different interpretations within a few years, where there has not been any demonstrated change in decisional law, statute, or circumstances to justify changing the law, then a court is justified in examining more closely the basis for the unexplained shift in the Board's decisions.
 
 
 95
 * We recognize that the Board's decision is not subject to De novo review merely because it was "a determination of pure agency law involv(ing) no special administrative expertise that a court does not possess." NLRB v. United Insurance, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). We also recognize the "authority of the Board to modify its construction of the Act in light of its cumulative experience . . . ." Beth Israel Hospital v. NLRB, 437 U.S. 483, 508, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978).[10] Beth Israel related to a new law applying the labor act to non-industrial public hospitals for the first time. However, the instant case merely called for an application of settled common law principles of agency law to uncontroverted facts under a statutory definition that has not been changed in any respect since it was significantly amended in 1947 to correct the construction that was applied in NLRB v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).
 
 
 96
 We also recognize, as the Supreme Court stated in NLRB v. Weingarten, Inc., 420 U.S. 251, 265, 95 S.Ct. 959, 967-68, 43 L.Ed.2d 171 (1975), that:
 
 
 97
 The use by an administrative agency of the evolutional approach is particularly fitting. To hold that the Board's earlier decisions froze the development of this important aspect of the national labor law would misconceive the nature of administrative decisionmaking.
 
 
 98
 The instant decision, however, is erratic rather than evolutional. In Weingarten the Board carried out its obligation to explain the shift by pointing to "significant developments in industrial life . . . ." 420 U.S. at 265, 95 S.Ct. at 967. Here the Board points to no significant developments, and refuses to recognize the precedential nature of its prior decisions. It tersely states: "suffice it to say that (cases coming to the opposite conclusion that such lessees are not employees) Must be narrowly construed. . . ."[11] (Emphasis added). That statement, and the factual recitations which lead merely to the conclusory judgment, fall far short of the reasoned analysis or satisfactory explanation that an agency must give when it seeks to ignore a line of precedential decisions and change the law established by judicial decisions.
 
 
 99
 We are not disposed to argue whether the Board has ignored prior precedent or whether the Board's decisions on this issue have, as it states, created a situation where, "Significantly, none of the later cases (arriving at a different result) overruled any of the prior cases."[12] Either situation requires us to examine its decision with especial care. An agency has an admitted discretion in matters of Policy, but the principal issue here is a matter of decisional law, not policy. As we indicated previously, the only significant development that impacted on the Board's current decision is the recent change in the composition of the Board that reversed the decision of the Administrative Law Judge and "narrowly construed" the latest existing precedents to the point of extinction.[13] Such erratic decisionmaking is unacceptable particularly as to Issues of law. While the Board is authorized to change its mind, when it does so it must at least carefully explain its reasons, justify the change and follow controlling law. Otherwise previously created propositions of law based on factual determinations operate as precedents, Stare decisis. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), C.f., Matter of Peyton Packing Co., 49 N.L.R.B. 828 (1943). Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). As Professor Davis wrote with respect to the Interstate Commerce Commission:
 
 
 100
 (An agency) not only may but must take notice of applicable law, whether the law is embodied in the Constitution, a statute, judicial decisions, or administrative decisions . . . That those decisions rested upon findings which in turn rested upon evidence, is no reason for saying that the (Interstate Commerce) Commission was not bound to follow them or to distinguish or overrule them.
 
 
 101
 K. C. Davis, Administrative Law Treatise § 15.04 at 376 (1958) (hereinafter Davis). While the Board may change its mind it cannot change the statutory and decisional law as fixed by court decisions following the express mandate of Congress. The Board's failure here to follow, not its own vacillating decisions, but the decisions of the federal courts cannot be condoned.[14]
 
 B
 
 102
 Our decision does not depend on the niceties between various standards of review and our conclusion that the Board's decisionmaking has been unacceptably erratic is not necessary to the result we reach. On the contrary, even if the Board's decision followed prior Board precedent, it would be necessary to reverse the Board's determination that the lessee cab drivers are "employees" under the National Labor Relations Act because it does violence to the intent of Congress and established principles of agency law as enunciated by the courts. The operative facts here fall considerably short of the amount and character of control necessary to a finding that the lessees are employees.
 
 
 103
 The Supreme Court has consistently stated that reviewing courts should Not Defer to the Board when the Board's decision is inconsistent with the statute that is supposedly being applied.[15] A recent decision to this effect is NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) where the Labor Board held that an employer's lockout of striking employees was a violation of the Act. The reversal of the Board by the Court of Appeals was affirmed by the Supreme Court despite the Board's claim, as here, that "the Court of Appeals exceeded the authorized scope of judicial review." The Supreme Court stated:
 
 
 104
 This proposition rests upon our statement in Buffalo Linen (353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676) that in reconciling the conflicting interests of labor and management the Board's determination is to be subjected to "limited judicial review." 353 U.S., at 96, 77 S.Ct. 643. When we used the phrase "limited judicial review" we did not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole shall be conclusive. National Labor Relations Act, as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e), (f) (1958 ed.). Courts should be "slow to overturn an administrative decision," Labor Board v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975, but they are not left "to 'sheer acceptance' of the Board's conclusions," Republic Aviation Corp. v. Labor Board, 324 U.S. 793, 803, 65 S.Ct. 982, 89 L.Ed. 1372. Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations Of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "(t)he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." American Ship Building Co. v. Labor Board (, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855) Post, at 318, 85 S.Ct. 955.
 
 
 105
 380 U.S. at 290-92, 85 S.Ct. at 987-988 (emphasis added). The Supreme Court recently reaffirmed the rule in Brown in NLRB v. Weingarten, Inc., 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975).[16] ("Reviewing courts are of course not 'to stand aside and rubber stamp' Board determinations that run contrary to the language or tenor of the Act . . . .").[17]
 
 
 106
 The cases cited by petitioners do not undercut the rationale of Brown. In NLRB v. Local 103, Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) the Court deferred to the Board's decision but only after noting that the decision was not "fundamentally inconsistent with the structure of the Act . . .[18] Similarly, in Beth Israel the Court stated:
 
 
 107
 The judicial role is narrow: The rule which the Board adopts is judicially reviewable for Consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced.
 
 
 108
 437 U.S. at 501, 98 S.Ct. at 2474 (emphasis added). Finally, United Insurance, infra, which is discussed more fully below, held that a reviewing court should not "displace the Board's choice between Two fairly conflicting views . . . ."[19] Thus, in each case, although the Court deferred to the Board, it indicated that courts should not defer when the Board's decisions conflict with the Labor Act. To this should also be added those cases where the Board has deviated from its previously existing position without satisfactory explanation.
 
 
 109
 In a number of cases since United Insurance, supra, on which petitioners chiefly rely, courts of appeals have found it necessary to reverse the Board's determination that certain workers were not "independent contractors." See, e. g., Lorenz Schneider Co., Inc. v. NLRB, 517 F.2d 445, 452-53 (2d Cir. 1975) (Friendly, J.); Assoc. General Contractors v. NLRB, 564 F.2d 271, 279 (9th Cir. 1977); SIDA of Hawaii, Inc. v. NLRB, 512 F.2d 354, 357 (9th Cir. 1975) ("This court recognizes that it may not displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it De novo. . . . (But) we cannot uphold the Board where it has in its 'application of the law to the facts overlooked accepted principles of the law of agency . . . .' (Brown v. NLRB, 462 F.2d 699, 702 (9th Cir.), Cert. denied, 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972)) . . . Quoting Carnation Co. v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970)."); Meyer Dairy, Inc. v. NLRB, 429 F.2d 697 (10th Cir. 1970).
 
 
 110
 In short, under United Insurance, Iron Workers, Beth Israel, and other cases, Supra, courts should defer to the Board's decisions as long as the decisions are consistent with the National Labor Relations Act, but none of these cases signal a departure from the admonition in Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839, that courts must not allow the Board to rule contrary to the tenor of the Act, which calls for the application of controlling principles of agency law. This case falls into that category and to the extent that the Board's decision refuses to find that the lessee cab drivers are independent contractors it is inconsistent with the Act, as interpreted by the courts. Under Brown, therefore, the Board's decision must be reversed.
 
 III
 
 111
 The National Labor Relations Act provides that "independent contractors" are not "employees." 29 U.S.C. § 152(3). Yet, the Board held here that the lessee cab drivers involved are "employees." In accordance with Brown, supra, we reversed the Board's decision because under the applicable law "we are able to determine that the lessees in this case were independent contractors . . . ." 195 U.S.App.D.C. at ---, 603 F.2d at 882.
 
 
 112
 Petitioners assert that the list of thirteen factors included in the Board's opinion[20] provides reasonable and substantial support for the Board's determination. Those thirteen factors are support for the Board's decision, however, only if they are evidence that the Companies have a "right to control . . . the means to be used in attaining the result. . . . (W)here the employer has reserved only the right to control the ends to be achieved, an independent contractor relationship exists." Yellow Cab Co., 229 NLRB 1329, 1332. See 195 U.S.App.D.C. at ---, 603 F.2d at 874.
 
 
 113
 Party Cab Co. v. United States, 172 F.2d 87 (7th Cir. 1949), also sets forth a good statement of the applicable law. At issue in that case was the status of lessee cab drivers under the taxing provisions of the Social Security Act, which taxed "employees". The Court quoted an excerpt from the applicable Treasury regulation which set forth the general standards to be followed in determining whether individuals were independent contractors or employees:
 
 
 114
 (G)enerally the (employee) relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the Details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the Means and methods for accomplishing the result, he is an independent contractor, not an employee.
 
 
 115
 172 F.2d at 92. (Emphasis added). This is the well recognized common law agency rule. The opinion also made it clear that:
 
 
 116
 The matter of control which is material is that which the plaintiff exercised over the drivers during the period they were in possession of the cabs rather than what the plaintiff might do either prior or subsequent to such period.
 
 
 117
 Id.
 
 
 118
 The issue, therefore resolves itself into determining whether the Board's thirteen enumerated factors are sufficient proof of the Companies' right to control the detail, means and methods by which the lessee drivers conduct their operations. The court's opinion already discussed these factors at some length, but more can be said. In considering the relevant facts, which are not in dispute, it must be recognized that the lessee drivers here do not work for hire, for wages or salaries, or under direct supervision. They are not paid any money by the Company. They depend for their income solely upon their own efforts and the profits that they are able to derive from the difference between their cost of leasing and operating the cab and what they collect from the public in fares.
 
 
 119
 At no time in the conduct of their operation are their physical activities controlled by the lessor. As the Board recognized, the lessees are "not required to operate in any prescribed manner, to accept any calls or dispatches, to report the location of the cab during the lease period, . . . to maintain the cab in any designated place,"[21] or to buy their gasoline from the company. In addition, "drivers are admittedly on their own once they leave the garage and are free to prospect for fares when and where they choose . . ."[22] There is only an agreement to pay a daily rate for the least of the cab, to use care and skill in driving it, and to comply with applicable laws and regulations. See, Restatement of Agency 2d, § 220, Comment (e) at 487-88. As in Associated General Contractor of California, Inc. v. NLRB, 564 F.2d 271 (9th Cir. 1977), where the Board was reversed and the drivers held Not to be employees, the lease of the cab to the driver placed the car in his exclusive domain and its operation while it was in the lessee's possession was beyond the authority of the company.
 
 
 120
 The lease arrangement between the parties also states that the parties intend to create an independent contractor relationship. This provision is pertinent to the nature of the relationship created since it is some indication of a refusal by the lessee to submit to pervasive control by the company and a recognition by the company of the absence of a master's control over the lessee. See, Restatement of Agency 2d, § 200, Comment (m) at page 492. The Treasury Department has also ruled that the drivers are not "employees" for purposes of the Social Security taxing statutes. From this it can be concluded that they pay income and social security taxes as self-employed persons.
 
 
 121
 We now address the Board's thirteen points. The italicized statement at the head of each of the following numbered paragraphs sets forth the fact the Board asserted in support of its conclusion:
 
 
 122
 1. "No investment in the instrumentalities of their work."[23] Generally, employees do not rent the tools of their trade from their employer or pay their operating costs nor put up bonds to compensate the employer for damage to his tools. Here, however, over the course of a year, a lessee driver will invest close to $7,000 in lease payments for the car and substantial additional sums in the necessary gasoline and oil. 195 U.S.App.D.C. at ---, 603 F.2d at 878. This sum of money, paid daily, cannot be considered as anything less than a substantial investment though the lessee never acquires title to the cab. The sums thus paid appear to be roughly equivalent to what a driver would invest if he were purchasing the cab though he gets more than just the cab. These facts contradict the Board's decision which states "the lessee drivers have No investment in the instrumentalities of their work."[24] (Emphasis added.) Payments totalling approximately $7,000 for the use of a cab for a year and a year's fuel costs are not insubstantial. In addition the lessee invests his entire time in the operation of the cab. He also posts bonds varying from $100 (Checker) to $250 (Yellow) to cover the cost of repairing the cab following accidents for which the lessee is at fault.
 
 
 123
 2. Goodwill. The Board asserts that "All goodwill arising from the operation of the cabs inure to the Companies' benefit."[25] (Emphasis added.) This factor, even if true, has no relevance to the Companies' control of the drivers. It is only of minimal, if any, importance.[26] Moreover, goodwill does inure Directly to the benefit of the lessees who drive the cabs. It is their principal stock in trade. Every fare a cab driver receives is based in substantial part on the goodwill which the drivers build up. The attractiveness of their cab service to passengers constitutes the principal basis for the income of the lessees. It is incorrect for the Board to state that the drivers do not benefit from the goodwill they create.
 
 
 124
 3. Drivers' work is essential to companies operations. This is true, but it has no relevance to the issue of whether the lessor controls the means and methods by which lessees operate their cabs. Moreover, one would expect this to be true in many recognized independent contractor situations. See Judge Friendly's comment in Lorenz Schneider Co., Inc. v. NLRB, 517 F.2d 445, 451 (2d Cir. 1975). For instance, many insurance companies operate through general agents and their sales are essential to the companies' operations, but this latter factor in no way converts such agents into employees. Any company can attempt to conduct certain phases of its operations through independent contractors and the fact that the operation is "essential" does not stamp as employees those who would otherwise be independent contractors.
 
 
 125
 4. Lease term is short and renewable at the companies' option. The Board finds control of the lessees in the companies' "use of day and night leases (i.e., those of less than 24-hour duration)" whereby it argues the companies "are able to prescribe the hours of work."[27] This argument conveniently overlooks that leases are available for "24 hour(s)" and "for 2 days at a time, or 3 days on weekends . . ."[28] Moreover, the term of the lease whether for 12 hours or 3 days does not Authorize the company to control the lessee in the manner in which he operates his cab. At most, it could furnish an opportunity for the companies to exercise some indirect control, but since there is no evidence that the companies use the threat of nonrenewal to exercise pervasive control over the manner and means in which drivers conduct their business, the provision in the lease does not furnish any support for the conclusion that the drivers are employees.[29] 195 U.S.App.D.C. at --- - ---, 603 F.2d at 877-878.
 
 
 126
 It is informative to contrast the variously expressed attitudes of the Board and the courts as to the probative effect of the duration of the relationship in these cases. Here, the Board argues that a short lease renewal at the Companies' option is indicative of an employee relationship. This is in sharp contrast to a decision in the 4th Circuit which commented that:
 
 
 127
 (T)he relatively permanent nature of the relationship and the manner in which it may be terminated . . . are more characteristic of the employment relationship than of independent contractor status.
 
 
 128
 NLRB v. A. S. Abell Company, 327 F.2d 1, 9 (4th Cir. 1964). Also in NLRB v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968) the court noted, as one element indicating an employee status, that "the agents have a Permanent working arrangement with the company under which they may continue as long as their performance is satisfactory." If permanence of relationship is an element that tends to indicate an employee relationship, and logic indicates that it does in many cases, then impermanence must be some indication of an independent contractor status. The Board's view that short and renewable leases are indicative of an employee relationship is thus in conflict with the view expressed by the Supreme Court.
 
 
 129
 5. Lease terms unilaterally set by the companies. This is evidence of bargaining power, but the Board does not explain how the terms of the lease, which are uniform, have in any way been used to control the drivers in the manner and means that they operate their cabs under the lease. Nothing in the record indicates that this power has been so used.
 
 
 130
 6. Lessee must obey municipal regulations. The Board has long recognized that agency regulations are evidence of government rather than employer control. Back in 1963, in Reisch Trucking and Transportation Co., Inc., 143 NLRB 953, 957 (1963), the Board stated: "(t)he control exercised by the Company over the work of owners and drivers is for the purpose of complying with the rules and regulations of the Interstate Commerce Commission and is not inconsistent with the independent contractor relationship." Similarly, in Portage Transfer Co., Inc., 204 NLRB 787 (1973) the Board held that truck drivers hauling steel who own their trucks, but lease them to their "employers" were independent contractors even though the "lease, consistent with ICC regulations, provides, that The lessor (drivers) shall surrender full control, possession and management of the leased equipment to the employer for the term of the lease."[30] (Emphasis added). These Board decisions are clearly applicable to the laws and regulations with which the instant lessees must comply and the Board has not offered any reasoned explanation as to why compliance here with the applicable local regulations is indicative of an employee relationship while the Greater "full control, possession and management" in Portage and Reisch is consistent with an independent contractor relationship. In Portage and Reisch the right to control in the company was Complete, yet because it resulted from a government regulation it was held not to upset the independent contractor relationship.
 
 
 131
 The same issue of required compliance with governmental controls was involved in Local 814, Int. Brotherhood of Teamsters v. NLRB, 178 U.S.App.D.C. 223, 564 F.2d 989 (1976), where after a remand (167 U.S.App.D.C. 387, 512 F.2d 564) to the Board to distinguish its decision therein (also referred to as Santini, 208 NLRB 184 (1974)), from its simultaneous decision in Molloy (208 NLRB 276 (1974), the Court approved the Board's Supplemental Decision holding the two cases were distinguishable because of the greater degree of control over household goods drivers that Molloy reserved. The principal difference, which the Board summarized, was that in Molloy
 
 
 132
 there was a layer of carrier regulation put upon the (owner-operators) Beyond what was required by government regulation, impairing the (owner-operators) independence.
 
 
 133
 223 NLRB at 752 (emphasis added). The Board thus did not find the control necessary to create an employee relationship in requiring compliance with rather broad government regulations but only with respect to the company imposed requirements "which went beyond the required governmental controls."[31] Judge Bazelon dissented on the ground that in the "seven factual distinctions between Molloy and Santini there is no Reasoned discussion as to why the (factual) distinctions are significant." 178 U.S.App.D.C. at 226, 546 F.2d at 992. (Emphasis added). We make the same point generally about the Board's opinions in this area.
 
 
 134
 Meyer Dairy, Inc. v. NLRB, 429 F.2d 697, 701 (10th Cir. 1970), reaches the same conclusion as to the effect of local regulations. The court there held milk truck drivers to be independent contractors although their "contract provides for certain standards which the distributors must maintain . . . (which) are designed to meet health and cleanliness standards . . . ."
 
 
 135
 In SIDA of Hawaii, Inc. v. NLRB, 512 F.2d 354, 359 (9th Cir. 1975); the Ninth Circuit also observed:
 
 
 136
 The Board has itself noted that the fact that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship.
 
 
 137
 See 195 U.S.App.D.C. at --- - ---, 603 F.2d at 875-877. The Board failed to follow or distinguish these decisions a fatal defect.
 
 
 138
 7. No subleasing is permitted. This restriction is designed to protect the lessors' property (the cab) by insuring that the licensed driver to whom they have agreed to lease the cab will personally drive the cab and not turn it over to some other person whose reliability and responsibility the lessor has not had an opportunity to determine. As long as the lessee is the driver, he is free to conduct his business as he pleases. 195 U.S.App.D.C. at --- n.45, 603 F.2d at 878 n.45.[32] Technically, this is a restriction, but it is not evidence of pervasive employer control over the means and method by which the lessee does his job. It is merely an exercise of normal business caution to contract with responsible people.
 
 
 139
 8. Companies discipline lessee drivers through the threat of city action. This is a partial repetition of 6 above.[33] The companies give notice to their drivers that they must follow the law. The drivers would be required to comply with the law even if the lease did not so provide. And companies would be required to cease doing business with drivers who used company property to violate the law even if the contract did not so provide. "(R)equiring drivers to obey the law is no more control by the lessor than would be a routine insistence upon the lawfulness of the conduct of those persons with whom one does business. . . . It is the law that controls the driver." 195 U.S.App.D.C. at 603 F.2d at 875. The general insistence that the driver comply with the law is Not the type of control of a driver that will create an employee relationship since the source of the control is statutory law and municipal regulations.
 
 
 140
 9. Drivers are subject to having their references checked when they apply for a lease. This is another factor which is not in any way probative of employer control over the manner and means in which the driver conducts his business.[34] The Board's reliance on this fact, which is not relevant to control, is a good example of the paucity of support for the Board's conclusion. We are particularly unimpressed with the Board's reference to the garage manager's "wide latitude" in deciding who qualifies to be a lessee. The Board states:
 
 
 141
 the lease garage manager will refuse to lease to someone who has a record of unsafe driving or is addicted to drugs, as well as to those who lack experience or who have no chauffeur's license. . . . As a practical matter, the lease garage manager will refuse to renew a lease for reason of a bad at-fault accident, unsafe driving, subleasing, drinking, and failure to pay money. . . . Customer complaints will not, however, constitute grounds for refusing to lease unless the complaint relates to matters which indicate unsafe driving, drinking, etc.[35]
 
 
 142
 In our view it is in the public interest that such policies should be followed by all transportation companies whether they operate through independent contractors or employees, and the application of operating policies to overcome such hazards is not indicative of that control that influences a determination of employee status.
 
 
 143
 10. Companies determine fault in accidents. This is a minor example of Company control over a business decision, but is not evidence of pervasive control.[36] That the decision as to who is Legally at fault in an accident is made in this way does not support the claim that the Company controls the means and methods by which the lessee conducts his operation.
 
 
 144
 11. 250 mile limitation. The mileage limitation for one day's driving (like the lease term) defines the outer boundary of the lease. A lessee driver is free to drive the cab as he pleases within the 250 mile limit. This is about twice as much mileage as the 111 miles that lessees drive their cabs in an average day.[37] The limitation operates to prevent subleasing. The Board's opinion virtually concedes that this is not an important restriction; it says "(t)heoretically, at least, this mileage limitation imposes a limit on the lessee drivers earnings."[38] But with 111 miles being the average daily mileage, a 250 mile limitation is more theoretical than real. Obviously this is not proof of pervasive employer control.
 
 
 145
 12. Dress restrictions. The Administrative Law Judge found that in practice dress restrictions were limited to a "no sandal" rule.[39] Beyond this the only dress restrictions are those imposed by municipal regulations.[40] The Union acknowledges that this is "not the most weighty control."[41] Actually, it is very minimal.
 
 
 146
 13. Workmen's Compensation. Illinois Courts have interpreted the Chicago Municipal Code as requiring cab companies to provide workmen's compensation insurance to all drivers, even if they are independent contractors. This is an example of government control. The requirement that such insurance be carried does not affect "the basic relationship established . . . (consensually) between the Companies and their drivers." 195 U.S.App.D.C. at --- - --- n.38, 603 F.2d at 876-877 n.38. It does not create an "employee" relationship under federal law. It merely means that independent contractors are to be covered by such insurance.
 
 
 147
 As a sub-part of the argument addressed to the workmen's compensation coverage the Board argues that one of the factors which "support our conclusion that the drivers herein are employees . . . (is that the) Companies have Considered offering group hospitalization and retirement plans . . ." (Emphasis added)[42] It further asserts that "(t)he absence of fringe benefits is of some relevance (as indicating that the lessees are independent contractors) but is of little probative value (especially in light of the fact that the Companies have Considered making fringe benefits available to the lessees)."[43] That is a specious argument: group hospitalization is clearly available to groups of independent contractors and retirement benefits can be worked out for the self-employed. To hold that merely "Considering " such plans somehow indicates a master-servant relationship is even more "far-fetched" than the rationale in Hearst, which Congress repudiated. Participation in group medical and liability insurance were also held not to bring the drivers into an employee status in Meyer Dairy, Inc. v. NLRB, 429 F.2d 679 (10th Cir. 1970).
 
 
 148
 Thus, of the thirteen factors listed by the Board, only 7, 10, 11 and 12 relate to control and these are plainly insufficient to support a finding that the lessee drivers are employees. The inclusion of the other 9 items, which for the reasons stated are not indicative of control over the manner and means of the drivers' operations, indicates that the Board is straining at gnats to find some evidence to support its conclusion that the drivers are " employees." The balance between "control" over the details of the cab driving operation and the independence of the drivers is heavily on the side of " independence". As Judge Sanborn found in Site Oil Company of Missouri v. NLRB,319 F.2d 86, 89 (8th Cir. 1963) each lessee is "free to exercise his independent operational judgment in the significant areas which would determine whether he made a profit or incurred a loss."
 
 
 149
 In reaching its conclusion the Board relied upon many factors that obviously are not indicative of an employer-employee relationship and it gave inordinate weight to factors which were merely very minimal instances of lessee control. This was substantially the same erroneous pattern that Judge Sneed pointed out the Board had followed in Associated General Contractors of California, Inc. v. NLRB, 564 F.2d 271 (9th Cir. 1977), in its attempt to support an expansion of its jurisdiction to include independent contractors.
 
 
 150
 Some circumstances, like the Companies' power to impose lease terms unilaterally, are evidence of economic power, but as the 9th Circuit stated in Carnation Company v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970), "(e)vidence of economic control is not necessarily proof of the kind of control that is relevant to a decision whether a person is a contractor or an employee." Other factors (for example, the subleasing prohibition, the 250 mile limit, the so-called limited dress restriction, and the Company's determination of fault in accidents) have a minor relevance, but neither alone nor collectively do they show "pervasive control"[44] that "so 'overshadow(s) considerations of the worker's right to assert his own prerogatives' that an employment relationship can be said to exist."[45] While only minor factors point toward employee status, the crucial factors, which permit the lessees to operate their cabs without the lessor controlling or supervising the means and method of their operation, indicate that the lessee drivers clearly are independent contractors.
 
 
 151
 The House Report on the bill that eventually excluded independent contractors from coverage under the National Labor Relations Act stated:
 
 
 152
 "Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits.
 
 
 153
 H.R.Rep.No.245, 80th Cong., 1st Sess. 18 (1947), Reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, 309 (1948). Except for the reference to hiring of others,[46] the lessee cab drivers involved here exactly fit the mold of those the House Report indicated were "independent contractors."Petitioners assert that we have established a Per se rule "that all persons who lease taxicabs are independent contractors for purposes of the Act, regardless of the extent to which the employer controls their actions while they are driving his cabs."[47] That is incorrect. We hold only that when the lessee drivers are not subject to that control by the Company that is determinative of employee status as determined By the courts, and by agency decisions cited by the Administrative Law Judge,[48] they clearly fall within the common law definition of independent contractors and the Board cannot bring them within its jurisdiction. In this case under well established common law rules of agency, the minor controls, analyzed above, are simply too insubstantial to justify a conclusion that the lessee cab drivers are "employees."
 
 IV
 
 154
 This opinion would be incomplete without a more detailed discussion of the legislative history of the controlling provisions of the statute and some of the subsequent judicial decisions that have excluded "independent contractors" from Labor Board jurisdiction.
 
 
 155
 * It all started with the Supreme Court decision by Justice Rutledge in NLRB v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). Therein the Supreme Court, reversing the 9th Circuit and affirming a NLRB decision, held that newsdealers were employees and subject to the Board's jurisdiction. The Supreme Court deferred to the Board's "(d)etermination (holding for coverage under the Act) . . . 'where all the conditions of the relation require Protection ' . . . ."[49] (Emphasis added). The opinion further stated that the Labor Act was "not confined exclusively to 'employees' within the traditional legal distinctions separating them from 'independent contractors.' " 322 U.S. at 126, 64 S.Ct. at 858. On the contrary, the Act applies to persons who were "subject, As a matter of economic fact, to the evils the statute was designed to eradicate." 322 U.S. at 127, 64 S.Ct. at 858 (emphasis added). Then, expanding on the theory that "economic fact" was to determine coverage under the Act, the court stated:
 
 
 156
 when the particular situation of employment combines these characteristics, so that the Economic facts of the relation make it more nearly one of employment than of independent business enterprise With respect to the ends sought to be accomplished by the legislation, those characteristics may outweigh Technical legal classification for purposes unrelated to the statute's objectives and bring the relation within its protections . . . (The Act's) applicability is to be determined broadly, in doubtful situations, by Underlying economic facts rather than technically and exclusively by previously established legal classifications. Cf. Labor Board v. Blount, supra (131 F.2d 585 (8th Cir. 1942)).
 
 
 157
 322 U.S. at 128, 64 S.Ct. at 859 (emphasis added).
 
 
 158
 The opinion proceeded to assign the "definitive limitation around the term 'employee' . . . primarily to the agency created by Congress to administer the Act. '(and) to the usual administrative routine' of the Board." 322 U.S. at 130, 64 S.Ct. at 860.
 
 
 159
 In United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), which shortly followed Hearst, Justice Reed applied the Hearst rationale to the same issue under the Social Security tax on "employees." In so doing he described the court's rationale in Hearst as follows:
 
 
 160
 We conclude that, since (the object of the Labor Act) was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of Economic reality. . . . We approved the statement of the National Labor Relations Board that 'the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and Protection afforded by the Act.' Labor Board v. Hearst Publications, 322 U.S. 111, 120, 124, 128, 129, 131, 64 S.Ct. 851, 88 L.Ed. 1170.
 
 
 161
 331 U.S. at 713, 67 S.Ct. at 1468. (Emphasis added).
 
 
 162
 Congress was so incensed with the fanciful construction of its legislative intention in Hearst that in 1947 it specifically excluded "independent contractors" from the coverage of the Act and condemned the Court's rationale in Hearst Publications as giving "far fetched meanings" to the words that Congress had used. Congress went on to state that the Board should give these words their "ordinary meaning." This means that the first step in determining the coverage of the Act is to decide whether the individuals involved meet the technical legal classifications of "employees." The Committee Report in the House, where the 1947 amendment originated, set forth the Congressional intent as follows:
 
 
 163
 (D) An "employee", according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire. But in the case of National Labor Relations Board v. Hearst Publications, Inc. (322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)), the Board expanded the definition of the term "employee" beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic "expertness" of the Board, upheld the Board. In this case the Board held independent merchants who bought newspapers from the publisher and hired people to sell them to be "employees". The people the merchants hired to sell the papers were "employees" of the merchants, but holding the merchants to be "employees" of the publisher of the papers was most far reaching. It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. In the law, there always has been a difference, and a big difference, between "employees" and "independent contractors". "Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not farfetched meanings but ordinary meanings. To correct what the Board has done, and what the Supreme Court, putting misplaced reliance upon the Board's expertness, has approved, the bill excludes "independent contractors" from the definition of "employee".
 
 
 164
 House Report No. 245 on H.R. 3020, p. 309.
 
 
 165
 The Conference Report on the Bill evidenced the same congressional intent:
 
 
 166
 Although independent contractors can in no sense be considered to be employees, the Supreme Court in N. L. R. B. v. Hearst Publications, Inc. (1944), 322 U.S. 111, 64 S.Ct. 851, 86 L.Ed. 1170, held that the ordinary tests of the law of agency could be ignored by the Board in determining whether or not particular occupational groups were "employees" within the meaning of the Labor Act. Consequently it refused to consider the question of whether certain categories of persons whom the Board had deemed to be "employees" were not in fact and in law really independent contractors.
 
 
 167
 House Conference Report No. 510 on H.R. 3020, p. 536-7, U.S.Code Cong.Serv.1948, pp. 1135, 1138.
 
 
 168
 Senator Taft, one of the principal contributors and advocates of the legislation, in remarks summarizing the principal differences between the Conference Agreement on H.R. 3020 and the Bill which the Senate passed, stated:
 
 
 169
 The legal effect of the amendment (exempting "independent contractors") therefore is merely to make it clear that the question whether or not a person is an employee is always a Question of law, since the term is not meant to embrace persons outside that category under the general principles of the law of agency.
 
 
 170
 93 Cong.Rec. 6441-6442 (emphasis added).
 
 
 171
 It is very significant to this case, as the Senator noted, that "the question whether or not a person is an employee is always a question of law." Id. It is a legal conclusion to be drawn from the facts not a question of policy. The court in Allied Chemical and Alkali Workers v. Pittsburgh Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) similarly observed that the Board's holding in such a case "depends on the application of law to facts, and the legal standard to be applied is ultimately for the courts to decide and enforce." 404 U.S. at 182, 92 S.Ct. at 399. Thus within our assigned duty we reverse the Board on a conclusion of law not a factual finding or a matter of policy.
 
 
 172
 In NLRB v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), Justice Black outlined very clearly what it was that the Court had earlier attempted in Hearst, and Congress's response to that effort:
 
 
 173
 Initially this Court held in NLRB v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, that "Whether . . . the term 'employee' includes (particular) workers . . . must be answered primarily from the history, terms and purposes of the legislation." 322 U.S., at 124, 64 S.Ct. 851. Thus the standard was one of economic and policy considerations within the labor field. Congressional reaction to this construction of the Act was adverse and Congress passed an amendment specifically excluding "any individual having the status of an independent contractor" from the definition of "employee" contained in § 2(3) of the Act. The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act. And both petitioners and respondents agree that the proper standard here is the law of agency. Thus there is no doubt that we should apply the common-law agency test here in distinguishing an employee from an independent contractor.
 
 
 174
 390 U.S. at 256, 88 S.Ct. at 989-999 (emphasis added) (footnote omitted).
 
 
 175
 The significant observation in this quotation is its description of the standard for coverage that Hearst had attempted and which Congress rejected, I. e., it was a standard whereby the ordinary meaning of the words used in the Act, principally the word "employee," would be largely ignored and the Board's jurisdiction would be determined by a "Standard . . . of economic and policy considerations within the labor field." When this standard was applied, workers who were considered to be subject "as a matter of Economic fact, to the evils the statute was designed to eradicate and . . . the remedies it afford(ed)," were to be found by the Board to be covered by the Act even though they might not be employees in the ordinary usage of that term. By this construction the court ruled that the Act would be applied to all situations where "employers and employees not in proximate relationship may be drawn into common controversies by Economic forces." (Emphasis added). This was truly a remarkable expansion. The application of the Act was to be determined "by underlying Economic facts rather than technically and exclusively by previously established legal classifications." (Emphasis added). Such construction did away with the application of common law principles of agency. Finally came the almost open ended standard for coverage that "where all the conditions of the relation require Protection, protection ought to be given." (Emphasis added) 322 U.S. at 127-29, 64 S.Ct. at 860.
 
 
 176
 The vice of this construction lay in the fact that it was grossly indefinite and it began at the wrong end. Instead of first determining that the workers in question were within the "legal classification" of employees as that word is normally understood, and therefore subject to the Act, it began by inquiring whether "economic forces," or "economic reality" as Silk interpreted Hearst, had drawn the parties into a controversy that the Board considered required "protection" in furtherance of the policy of the Act. If so they were found to be subject to the Act even though they might not be ordinarily considered to be employees. The opinion continued on to state that the task of making a completely definitive limitation around the term of employee was "assigned primarily to the agency created by Congress to administer the Act." 322 U.S. at 130, 64 S.Ct. at 860.
 
 
 177
 So under the construction of the Act in Hearst the Labor Board was to define the extent of its own jurisdiction by discarding "established legal classification(s)." When "Economic facts " or "economic reality" indicated with respect to individuals "drawn into common controversies by Economic forces " that there existed a "relation (that) require(d) Protection " under the Act, the Board was to rule that such "protection" be given the individuals in question even though they might be independent contractors, lessees, or joint venturers.
 
 
 178
 As indicated above, this construction of the Board's jurisdiction under the Act was completely rejected by Congress in its 1947 amendments and so recognized by the Court in United Insurance Co., and Allied Chemical, supra.
 
 
 179
 The decision in United Insurance, held, as had been generally recognized, that debit agents of insurance companies are employees. Basically debit agents are collectors of insurance premiums who go door to door in a prescribed area on a regular basis under supervision by the company. They participate in fringe benefits and are paid a percentage of the premiums collected. Collected premiums are turned in weekly. The case "involved the application of law to facts" as the court stated:
 
 
 180
 The Board examined all of these facts and found that they showed the debit agents to be employees. This was not a purely factual finding by the Board, but involved the application of law to facts what do the facts establish under the common law of agency: employee or independent contractor? It should also be pointed out that such a determination of pure agency law involved no special administrative expertise that a court does not possess. On the other hand, the Board's determination was a judgment made after a hearing with witnesses and oral argument had been held and on the basis of written briefs. Such a determination should not be set aside just because a court would, as an original matter, decide the case the other way. As we said in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, "Nor does it (the requirement for canvassing the whole record) mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it De novo." 340 U.S., at 488, 71 S.Ct. 465. Here the least that can be said for the Board's decision is that it made a choice between two fairly conflicting views, and under these circumstances the Court of Appeals should have enforced the Board's order. It was error to refuse to do so.
 
 
 181
 390 U.S. at 260, 88 S.Ct. at 991, 992. (Emphasis added).
 
 
 182
 We also note the admonition of Justice Reed that the determination of independent contractor status from litigated facts is not a "specialized field of knowledge" to the extent that the Labor Board "carr(ies) the authority of an expertness which courts do not possess and therefore must respect . . ." Radio Officers v. Labor Board, 347 U.S. 17, 50, 74 S.Ct. 323, 341, 98 L.Ed. 455 (1954).
 
 
 183
 The opinion of the majority of the Board in the instant case seeks support from the same rationale of Congress' intent as was expressed in Hearst Publications, and that Congress specifically rejected as far back as 1947. Thus, the current Board opinion vaguely claims its conclusion is supported by the "Business realities " of the relationship, which is merely another way of relying upon what Hearst Publications described as "economic facts,"[50] and what Silk referred to as "economic realities."
 
 
 184
 Such contentions are a repetition of the same argument advanced by the dissent to Columbus Green Cabs, Inc.
 
 
 185
 In my view, the majority is following its new direction as seen in Greater Houston Transportation, ignoring significant evidence and giving no credence to the Business realities involved.
 
 
 186
 214 NLRB 751, 753.
 
 
 187
 The Board also argues here that its prior decision in Columbus Green Cabs, Inc., which held cab drivers, who were subject to more control than those here, were independent contractors, was to be narrowly construed "in order that employees not be denied the Protection of the Act through an undue extension of independent contractor status."[51] This is a partial reversion to the same "protection of the Act" argument that was advanced in Hearst as a beginning point in determining coverage, and thereafter rejected by Congress, United Insurance and other decisions.
 
 
 188
 The dissent in Greater Houston Transportation, 208 NLRB 1020, 1023 (1974) presented another argument rejected after Hearst when it contended that the drivers should be covered under the Act because "the effect upon Commerce of a work stoppage by drivers in the system would be substantial." Cf., NLRB v. Hearst Publications, Inc., 322 U.S. 111, 126, 64 S.Ct. 851, 858, 88 L.Ed. 1170 (1944) ("The Act, as its first section states, was designed to avert the 'substantial obstruction to the free flow of commerce' which result from 'strikes and other forms of industrial strife and unrest' by eliminating the causes of that unrest.")
 
 
 189
 It is difficult to know exactly what the members of the Board are referring to when they rely on "economic facts," "economic realities" and "business realities." Plainly such vague generalities do not rise to the dignity of factual findings. There is a strong indication that the Board is harking back to vestiges of the Hearst rationale when it includes among the numerated items in its opinion many that are Not indicative of control but nevertheless are illogically relied upon as upholding a determination of employee status. The factors the Board enumerated that clearly fall into this category are: (2) Goodwill; (3) Drivers' work is essential to Companies' operations; (4) Lease term is short and renewable at the Companies' option; (5) Lease term unilaterally set by the Companies; (9) Drivers are subject to having their references checked when they apply for a lease; and (13) Workmen's Compensation. The Board has been criticized for giving Inordinate weight to isolated examples of company control and to factors which are Not persuasive evidence of the employer-employee relationship. Associated General Contractors, supra, 564 F.2d at 280. The Board's reliance on the above numerated factors is another example of this.
 
 
 190
 Also when the Board points in its Petition for Rehearing, at 3, to the substantial number of lessees it implicitly is contending that since the drivers are a large group they obviously should be given "protection" and be deemed to be "employees" because of their number and substantial effect on commerce. Actually, the number of drivers involved is an irrelevant consideration as to whether or not they are employees subject to the Act. The numbers argument is a reversion to part of the Hearst rationale and ignores the fact that Congress gave "independent contractors" as much right to be excluded from the Board's jurisdiction, regardless of their numbers, as "employees" were given to be included, regardless of their numbers.
 
 
 191
 To argue further that prior decisions applying the control test and holding certain individuals to be independent contractors should be given a "narrow construction" is nothing more than an attempt by the Board in its construction of the Act to ignore the Congressional direction that the terms "independent contractors" and "employees" be given their "ordinary meanings" not narrow meanings. House Report, supra. Congress was very specific in its language and it was very specific in the Committee Report that it intended its 1947 amendment to be given its ordinary meaning, the same as the other provisions in the Act. The Board's "narrow construction" does not do that.
 
 B
 
 192
 The history delineated above establishes that principles of agency law determine whether a worker is an employee or an independent contractor, and that "employee" and "independent contractor" are to be given their "ordinary meanings" by the Board. It is not acceptable for the Board to expand its jurisdiction by a narrow reading of "independent contractor." Congress clearly intended that only Employees would be covered by the Act. Thus, if a worker is an independent contractor, as that term is normally understood, then the Board has no authority under the Labor Act.
 
 
 193
 We have already cited a number of decisions in which courts of appeals have reversed the Board on this point. See, e. g., Associated General Contractors v. NLRB, 564 F.2d 271 (9th Cir. 1977), SIDA of Hawaii, Inc. v. NLRB, 512 F.2d 354 (9th Cir. 1975), Brown v. NLRB, 462 F.2d 699 (9th Cir.), Cert. denied, 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972), Carnation Co. v. NLRB, 429 F.2d 1130 (9th Cir. 1970), Meyer Dairy, Inc. v. NLRB, 429 F.2d 697 (10th Cir. 1970), NLRB v. A. S. Abell Company, 327 F.2d 1 (4th Cir. 1964). Party Cab Co. v. United States, 172 F.2d 87 (7th Cir. 1949) reaches the same conclusion under the Act taxing "employees" compensation. Another important case is Lorenz Schneider Co., Inc. v. NLRB, 517 F.2d 445 (2d Cir. 1975). In Lorenz Schneider, Judge Friendly writing for the court, made an observation that conforms to our own view of the Board's decisions in the area of "independent contractors":
 
 
 194
 the natural tendency of the Board and of reviewing courts to look primarily to other NLRB cases involves some degree of moving away from the "pure agency law" test mandated by Congress in the Taft-Hartley Act and inching back toward the view expressed in the Hearst opinion, 322 U.S. at 124, 64 S.Ct. at 857 . . . that "Congress had in mind a wider field than the narrow technical legal relation of 'master and servant' . . . ."
 
 
 195
 517 F.2d at 453 n.15. The court stated that reviewing courts should resist this tendency, and must reverse the Board whenever its application of agency principles is erroneous. Judge Friendly wrote:
 
 
 196
 We cannot say that here the Board had no basis for its conclusion. But Universal Camera, as implemented in this area by United Insurance, could not have meant to extend immunity from judicial review that far; to do so would run counter to the whole thrust of that important opinion as to the new "mood" concerning judicial review, 340 U.S. 487, 71 S.Ct. 456, 95 L.Ed. 456, which Congress carried into the Taft-Hartley Act and the APA. The respect required to be accorded the Board's application of "pure agency law" surely cannot exceed what is demanded when it acts Within the area of its expertise, where "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view", 340 U.S. 488, 71 S.Ct. 465. A reviewing court must bow to the Board's view in an area outside its expertise only when this is "Fairly conflicting" (emphasis added).
 
 517 F.2d at 453.[52]
 
 197
 The foregoing comments are equally applicable here and they accurately express our opinion and findings as to the instant case. Particularly in view of those frequent instances where the Board enumerated items it considered evidence of a master-servant relationship, when in reality they were not relevant to control, we cannot conscientiously agree when the common law test is applied to the whole record that there is substantial evidence Fairly supporting the Board's decision.
 
 V
 
 198
 In our initial opinion we reversed the Board's decision that "the Companies unlawfully refused to bargain about their decision to lease cabs to drivers,"[53] and held that "the companies' unilateral action was not an unfair labor practice because the union itself made any negotiation impossible by imposing an improper condition as a prerequisite to bargaining."[54] The Board and the Union contend that this was error. They maintain that the "panel's conclusion is simply not supported by the record"[55] and that "the panel has wholly misapprehended the rationale of the Board's decision."[56] They also contend that Fibreboard principles were violated by some comments in the decision. We have reviewed the petitioners' points in this respect and as hereinafter indicated we rest our opinion in this regard wholly upon the Union's improper refusal to bargain.
 
 
 199
 Both the Administrative Law Judge (ALJ) and the Board acknowledged that the Union refused to bargain about leasing unless it was recognized as the bargaining representative of the lessee drivers. The ALJ conceded that the Companies "had no intention of permitting the Union to participate in (the decision to lease.)" In addition, however, he found:
 
 
 200
 For its part, the Union was equally adamant in insisting that any negotiations about the leasing program be conditioned upon company recognition of the Union as the collective bargaining representative of the lessees.[57]
 
 Later in his opinion the ALJ held:
 
 201
 the Union precluded bargaining along these lines (about the decision to go into leasing) by adamantly insisting that it could not consider any alternative to the Companies' plan unless they recognized the Union as the bargaining representative Of the lessees under the existing collective bargaining contract.[58]
 
 
 202
 In its opinion reversing the ALJ, the Board did not contest this factual finding. It stated: "The Union, for its part, insisted that any negotiations about the leasing program be conditioned upon company recognition of the Union as the collective bargaining representative of the lessee drivers."[59] Yet despite this Union imposed prerequisite to bargaining, the Board held that the Companies were guilty of unfair labor practices. The Board stated:Given the Companies' preordained refusal to bargain about the decision to lease, we, contrary to the Administrative Law Judge, find it immaterial and no defense for the Companies that the Union adamantly sought to condition negotiations upon its being recognized as the bargaining representative of the lessee drivers.[60]
 
 
 203
 The Board's decision is wrong as a matter of law. A union "may not insist on recognition as representative of persons wholly outside the coverage of the Labor Act."[61] If a union requires such recognition as a pre-condition to bargaining, then the employer's refusal to bargain on those terms is not an unfair labor practice. As Judge Friendly wrote:
 
 
 204
 if a union insists on speaking on behalf of persons for whom it cannot properly so insist, an employer cannot be faulted for refusing to bargain.
 
 
 205
 NLRB v. Kelley Brothers Nurseries, Inc., 341 F.2d 433, 440 (2d Cir. 1965).[62]
 
 
 206
 Here, the Union wrongly pre-conditioned its willingness to bargain on the companies' recognition of it (the Union) as representative of the lessee drivers. Since those drivers are independent contractors, the Union has no right to represent them.[63] More important, the Union had no right to refuse to negotiate about the leasing decision until it was recognized. By making recognition a prerequisite to bargaining, the Union effectively excused the companies' obligation to bargain.
 
 
 207
 The Board did not explain why it concluded that the Union imposed prerequisite to bargaining was "immaterial." The most likely reason is that in the posture of the case then, the Union was entitled to be the bargaining agent for the lessee drivers. The Board's opinion held that those drivers were "employees" subject to the coverage of the Labor Act. Assuming that, there is nothing unfair or unreasonable about the Union requiring the Companies to recognize it as bargaining agent for those "employees." After all, the Union has long been "certified as the collective-bargaining representative of both Companies' employees. . . ."[64] But the whole justification for the Board's decision crumbles in light of our holding that the lessee drivers are independent contractors, not employees. Independent contractors are outside the coverage of the Labor Act, and a union may not require that it be recognized as the representative of independent contractors as a condition to participating in negotiations.
 
 
 208
 Another possible justification for finding the Union's refusal to bargain to be "immaterial" is that the Companies were allegedly "first" in refusing to bargain. Though this argument was not made in its opinion, the Board's petition for rehearing states: "it was the Companies which first adopted an intrasigent attitude on the subject, wholly independent of any actions on the Union's part. . . ."[65] We find this newly advanced argument to be based on an incomplete application of the admitted facts[66] and to be unpersuasive.
 
 
 209
 Neither the Board's nor the ALJ's opinion establishes that the Companies' refusal to bargain was the cause of the Union's refusal to negotiate. The Board's petition for rehearing alleges two grounds that assertedly prove that the Companies' decision to lease was irrevocable long before the negotiation process started: (1) "the Companies began formulating their leasing plans as early as the summer of 1974 . . .; . . . the Union indirectly found out about the plans shortly thereafter, and sought a meeting, which the Companies refused"; and (2) "the Companies did not meet with the Union until the following summer, when the Companies specifically stated that, 'We are not asking for your permission (to lease). We are going to do it.' . . ."[67] Because of other facts which were overlooked neither fact proves the Board's contention.
 
 
 210
 (1) The Company's refusal to negotiate in the summer of 1974 is irrelevant to this appeal. First, the Board's complaint, which defines the boundaries of this case, cites the Companies' alleged refusal to bargain "(s)ince on or about June 5, 1975. . . ."[68] The complaint, and therefore this appeal, has nothing to do with alleged refusals to bargain before that date.[69] Second, there is a good reason for the June 5, 1975 date in the Complaint. In 1974 the Companies were considering a different leasing plan involving the transfer of cab licenses to separate companies to be newly incorporated as wholly owned subsidiaries. When this transfer was denied by the city of Chicago, the Companies "for the first time manifested consideration of a plan for direct leasing of cabs."[70] The alleged refusal to bargain involved in this appeal is with respect to the subsequent direct leasing plan, not with the discarded plan to use new corporations. The Companies' position on bargaining about the earlier leasing plans is irrelevant, and was not cited as evidence of the Companies' intransigence by either the ALJ or the Board. To raise it now also amounts to impermissible Post hoc rationalization.[71]
 
 
 211
 (2) While it is true that the ALJ and the Board found that the Companies "had no intention of permitting the Union to participate in (the decision to lease)"[72], this finding does not establish that the Companies' decision was reached "first," or that it caused the Union to take a hard line. There is a great deal of evidence that the Union was every bit as intransigent on the leasing question as the Companies were. In its statements to the press, the Union indicated that it was opposed to leasing.[73] When the Companies subsequently "Invited discussion (with the Union) before their final decision" (emphasis added), they referred to the Union's public position on leasing, and asked the Union to "confirm, deny, or qualify" its earlier statements.[74] The Union never responded to this request. Thus, even if the Companies were the first to take an intransigent position they subsequently offered to correct their error and negotiate thereon but the Union refused to negotiate. And there is evidence that the Union's only comment to the Companies during June, 1975, when negotiations were under way was to "(g)et out of the leasing business."[75] Thus the evidence indicates that the Union, like the Companies, was unwilling to bargain about leasing.
 
 
 212
 More important, neither the ALJ nor the Board concluded from the evidence that the Companies' refusal to bargain caused the Union's intransigent position on the recognition issue. Both the Board and the ALJ found that the Companies had a preordained position on leasing, And that the Union would not negotiate at all unless it was recognized as representative of the lessee drivers. Though they disagreed as to the significance of the Union's precondition to bargaining, the Board and the ALJ approached the question in exactly the same way. The ALJ wrote:
 
 
 213
 If General Counsel is correct, and the lessees are employees within the bargaining units, then the Union was entitled to adhere to its contractual rights, and the Companies violated the contract and the Act by embarking upon leasing. If, however, General Counsel is wrong, then the Union effectively precluded negotiations about leasing by conditioning such negotiations on a nonmandatory subject of bargaining, i. e., recognition of the Union as representative of a group of individuals who were either not employees or who were employees outside of the bargaining unit.[76]
 
 
 214
 Similarly, the Board recognized and applied the principle that the scope of the valid bargaining unit controls the extent of the bargaining obligation:[77]
 
 
 215
 If, as General Counsel and the Union contend, the lessee drivers are employees within the meaning of the Act, then by failing to apply the terms of its collective-bargaining agreement with the Union to these lessees the Companies violated Section 8(a)(5) of the Act. If, as the Companies contend (and the Administrative Law Judge found), the lessee drivers are not employees within the meaning of the Act, but are instead independent contractors, then Respondent Companies' refusal to recognize the Union was not a violation of the Act.[78]
 
 
 216
 The Board and the ALJ reached opposite results because the Board held that the lessee drivers were employees, whereas the ALJ found them to be independent contractors. The Board's conclusion did not rest on the Companies' alleged responsibility for the Union's precondition to bargaining.
 
 
 217
 In short, neither the evidence nor the opinions below support the Board's assertion that the Companies are primarily responsible for the break-down of negotiations. On the uncontroverted facts, such a conclusion would be remarkable. Even accepting the Union's position, the Companies only had "preordained" views on the issue of whether to institute a leasing program. There is absolutely no evidence that the Companies would not negotiate on the details of a leasing plan and there is evidence that they subsequently "invited" such discussion. The Union, however, refused to bargain entirely both with respect to the decision to lease and the details of any leasing plan. Thus, if it were necessary to decide which party was more at fault in the last analysis, we would have to choose the Union.
 
 
 218
 With respect to its representation of the commission drivers the opinion of the Administrative Law Judge found the following uncontroverted facts:
 
 
 219
 The Union raised some questions about the possible impact of the leasing program upon the commission drivers and the commission fleet. However, the Union never requested the Companies to bargain about any possible or asserted removal of work from the commission fleet, beyond declaring its opposition to leasing, nor did the Companies manifest an unwillingness to discuss such matters as distinct from their decision to go into leasing. If, for example, the Union felt that the Companies were failing to provide their commission drivers with cabs, as provided in article III, section 3 of their contract, or were unreasonably suspending or discharging commission drivers for low bookings or high mileage, whether or not such actions were influenced by the leasing program, they could have filed appropriate grievances and pursued them to arbitration. However, the Union did not do so. Moreover, as will be discussed Infra, such matters are beyond the scope of the present complaint.[79]
 
 
 220
 In summary, the Union refused to bargain unless it was recognized as bargaining representative for the lessee drivers. Since the lessee drivers are not employees, the Union had no right to make this demand. This Union imposed obstacle to bargaining undercuts the Union's claim that the Companies committed an unfair labor practice by refusing to bargain.
 
 Conclusion
 
 221
 We adhere to our conclusion that the leasing of the cabs did not constitute a hiring of the lessees under a master-servant relationship and that the companies did not commit an unfair labor practice within the period covered by the General Counsel's complaint. The petitioners' motions, addressed to the division of the court, to rehear the case are therefore denied.
 
 
 222
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 [1]
 Yellow and Checker Cab Companies are related corporate entities (Yellow is a wholly owned subsidiary, JA 37a). Together they provide three-fourths of the taxis in the Chicago area. The total number of cab licenses is fixed at 4,600 of which Yellow holds 2,166 and Checker 1,500. JA 3a. Both are employers engaged in commerce within the meaning of section 2(6) and (7) of the Act, JA 34a
 
 
 [2]
 228 NLRB 1311 (1977)
 
 
 [3]
 The Union was certified as the commission drivers' collective bargaining representative in 1961, JA 3a; Checker Taxi Co. et al., 131 NLRB 611 (1961)
 
 
 [4]
 The additional remedies requested by the Union were the reimbursement to the cab drivers of "take-home fees," unlawfully collected from them, See section V and VI, Infra, and to compensate the union for initiation fees and dues allegedly lost by the Companies' refusal to recognize it as the bargaining agent for lessee drivers, See section VI, Infra
 
 
 [5]
 Yellow has been engaged in business for over 60 years and Checker since 1951. JA 39a
 
 
 [6]
 The conditions in the cab industry were sufficiently poor that the Union president himself consented to expedited negotiations during the summer of 1974 so that a new collective bargaining agreement could be reached in time for the City Council to vote on a proposed cab fare increase. On August 21, 1974 the Council approved a 19 per cent fare increase rather than the requested 25 per cent increase. This rate increase did little to improve the financial condition of the companies, and did nothing to reduce the "irregular but perceptible decline" in the total number of shifts worked by drivers. The primary cause of this decline was the decrease in full-time drivers. JA 43a-44a (Findings of the Administrative Law Judge)
 
 
 [7]
 For an example of the tone of these meetings, when the Company attorney asked the Union attorney if the Union had any proposals to discuss, the truculent response was: "Yes, I have. Get out of the leasing business." JA 46a (Findings of the Administrative Law Judge)
 
 
 [8]
 JA 46a (Findings of the Administrative Law Judge)
 
 
 [9]
 JA 5a, 47a (Findings of both the Board and the Administrative Law Judge)
 
 
 [10]
 Despite an absence of solicitation, leasing was obviously much more attractive to the drivers than commission work. As of November, 1977, only two-and-a-half years after leasing began some 72% Of the Yellow and Checker drivers were lessees rather than commission operators, Brief for Union as Intervenors in No. 77-1673 at 33. Perhaps the popularity of leasing was due to the lack of control that the drivers felt they were under from the Company when they leased as opposed to driving for a commission. A lessee witness testified, concerning leasing: "No trip sheet, nothing. No problem. It is free and I really like that. I love it. I am free" (Tr. 1183)
 
 
 [11]
 Checker requires a $100 bond; Yellow requires a $250 bond, JA 49a
 
 
 [12]
 JA 38a (Findings of the Administrative Law Judge)
 
 
 [13]
 JA 60a, 62a
 
 
 [14]
 JA 2a-3a, 12a-17a
 
 
 [15]
 JA 11a-17a
 
 
 [16]
 JA 17a
 
 
 [17]
 Ordinarily, we show considerable deference to the judgment of the NLRB, E. g., IBT, Local 782 v. NLRB, 126 U.S.App.D.C. 1, 373 F.2d 661, Cert. denied sub nom. Blue Cab Co. v. NLRB, 389 U.S. 837, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967); NLRB v. Circle Bindery, Inc., 536 F.2d 447 (1st Cir. 1976); Frattaroli v. NLRB, 526 F.2d 1189 (1st Cir. 1975). However, where the issues involved are purely legal or otherwise outside the Board's particular expertise, the Board's interpretation is entitled to no particular deference, Retail Clerks International Ass'n Local 455 AFL-CIO v. NLRB, 166 U.S.App.D.C. 422, 510 F.2d 802 (1975) (contract interpretation). See NLRB v. Universal Services, Inc., 467 F.2d 579, 584 n. 5 (9th Cir. 1972); Jaffe, Judicial Control of Administrative Action 549-550 (1965)
 
 
 [18]
 See pages --- - --- of 195 U.S.App.D.C., pages 872-878 of 603 F.2d
 
 
 [19]
 The Board has provided so little rationale for its decisions that the Administrative Law Judge was lead to conclude that the only way to reconcile the Board precedents relating to trucks, E. g., John Himmer Transfer, Inc., 221 NLRB No. 52 (1975); Penn Versatile Van Division of Penn Truck Painting and Lettering Corp., 215 NLRB 843 (1974); Dixie Transport Company, 218 NLRB 1243 (1975), and that relating to cabs in the same leasing context was simply to conclude "that there is one line of authority for trucks and another for taxis," JA 60a
 
 
 [20]
 For example, Members Miller, Kennedy, and Penello have uniformly voted to find that driver-lessees are independent contractors, E. g., Barwood, Inc., 209 NLRB 19 (1974); Greater Houston Transportation Company d/b/a Yellow Cab Company, 208 NLRB 1020 (1974); Columbus Green Cabs, Inc., 214 NLRB 751 (1974), while Members Fanning and Jenkins have uniformly voted to find vehicular lessees to be employees, See cases cited Supra and John Himmer Transfer, Inc., 221 NLRB 284 (1975); Association of Independent Taxicab Operators, Inc., T/A Diamond Cab, 164 NLRB 859 (1967). When the present case came before the Board, the panel which heard the case consisted of four members. Predictably, Members Fanning and Jenkins voted to find vehicular lessees to be employees (joined by Chairman Murphy, a February 18, 1975 appointment). Member Penello dissented. Administrative agencies cannot function in that vacillating manner
 
 
 [21]
 JA 14a-15a. The General Counsel to the NLRB has referred rather euphemistically to the "ebb and flow" of the Board's decisions in this area, JA 59a (Findings of the Administrative Law Judge) See note 19, Supra. The Board will have to indulge in less flow
 
 
 [22]
 JA 15a (decision of the NLRB)
 Subsequent to oral argument and while this opinion was circulating counsel for the NLRB and the Union directed our attention to the NLRB's decision of August 25, 1978 in Columbus Green Cabs, Inc., et al., 237 NLRB No. 176, which involved the same drivers whose status was adjudicated four years earlier in the first Columbus Green Cabs case, Supra. The cab drivers that Were held to be independent contractors in 1974 are Now held by the Board to be employees. In its recent opinion the Board states:
 Although the Board found in the 1974 Decision involving the Employer that the drivers therein were independent contractors, our findings as to the employee status of the drivers in the instant case are based on an expanded current record which contains a number of factors not discussed in our earlier Decision, as considered in the light of recent taxicab cases. . . . (T)he current record contains evidence concerning the relationship between the drivers and the taxicab Companies which is similar to that presented in recent taxicab cases. Accordingly, we do not deem ourselves bound by the earlier Decision which was based on a more limited record. (Footnotes omitted.)
 
 
 [237]
 NLRB No. 176 at 9-10
 The Board's flip-flop in Columbus Green Cabs highlights the erratic nature of its opinions which decide whether cab drivers are employees or independent contractors. The shift in the second Green Cabs case was predictable since the new panel included both Fanning and Jenkins. See note 20, Supra. In the 1974 decision Chairman Fanning had dissented.
 Moreover, the 1978 opinion gives only perfunctory attention to the 1974 decision that was being reversed. The Board cited two factors in the "expanded current record" that distinguish the situation in 1974 from that in 1978:
 (1) the employer's unilateral revision of the lease, (2) its arrangement with the railroads, its detailed contracts with the city of Columbus concerning school trips and the airport concession, and the many mandatory provisions and specific directions set forth in these contracts as well as in the manual.
 
 
 [237]
 NLRB No. 176 at 10. The first factor was mentioned by Chairman Fanning in his 1974 dissent and therefore cannot explain the different result in 1978. The second factor involves some elements of control which might be probative of employee status, but it has no factual counterpart in this case. Thus the result in Columbus Green Cabs II is not inconsistent with the result we reach here
 
 
 [1]
 Unilateral revision of the lease. The NLRB states in Green Cabs II that "the provisions of the lease are prepared by the Employer which has unilaterally and without negotiation with the drivers changed the rental and mileage fees." 237 NLRB No. 176 at 8. This same point had already been discussed in the opinion in the instant case. See note 25(5), Infra. The employer's ability to unilaterally determine lease terms is evidence of superior bargaining power. But as we indicate, Infra at --- of 195 U.S.App.D.C., at 873 of 603 F.2d, the question is not whether the cab company has economic power; rather it is whether the company has used its power to establish contract terms controlling the manner and means in which the lessees go about their cab business. In short, the ability to establish lease terms unilaterally is not in itself enough to establish the existence of an employer-employee relationship. The critical question is whether the terms of the lease vest excessive control in the lessor
 In addition, the company's economic bargaining power is not a basis for distinguishing the 1974 Columbus Green Cabs decision from the 1978 decision. In Member (now Chairman) Fanning's dissent from the 1974 decision, he pointed out that
 the Employer( ) retain(s) the ultimate power to refuse to renew, or to rescind, a lease at any time for any cause. . . . I am not persuaded by the Employer's contention that the lease fee can be negotiated when the record shows only that the Employer occasionally accepts less than the usual fee when a driver gets sick on the job.
 
 
 [214]
 NLRB 751, 753-4. Thus, the ability of the company to unilaterally determine a particular term in the lease provisions is not the kind of new fact that warrants the NLRB's conclusion that its earlier decision is not a binding precedent in this case
 
 
 [2]
 Contracts. According to the 1978 opinion, Columbus Green Cabs agreed to provide regular service at the railroad and the airport and contracted with the school board for the transportation of handicapped students to school. 237 NLRB No. 176 at 6-7. The extent to which drivers who participate in these programs must follow "special instructions" governing the manner in which they perform their job (Id.) is relevant to whether those drivers are independent contractors or employees. As we indicated, Supra at ---- of 195 U.S.App.D.C., at 873 of 603 F.2d, the critical question is the company's right to control the manner in which the driver does his job
 However, there are no "special instructions" in the instant case. On the contrary, the Companies exercise virtually no control over the drivers. While the drivers are required to comply with applicable municipal regulations, this would be the case even though it were not so provided in the leases. See ---- - ---- of 195 U.S.App.D.C., at 875-876 of 603 F.2d, Infra. The result in the 1978 Columbus Green Cabs case (to the extent that it depends on the existence of "special instructions" that the drivers must follow), then, does not conflict with the result we reach.
 Another point stressed in the 1978 Columbus Green Cabs opinion is that calls from dispatchers account for "75 to 80 percent of (each driver's) trips." 237 NLRB No. 176 at 5. This fact is not evidence of the company's right to control the drivers, for as the Board admits, "drivers are not required to observe special hours or restrict themselves to the calls from dispatchers." Id. Moreover, it is no basis for reversing the 1974 result. Chairman Fanning made Exactly the same point in his 1974 dissent:
 (T)hese drivers rely heavily on calls from the dispatch service, which furnishes the best chance to make money, as Employer admits; drivers keep their radios on and use the cab stands. To say that a driver has the "discretion" to cut himself off from what amounts to 70 percent of the business available to him is simply not realistic.
 
 
 [214]
 NLRB at 754
 In summary, the facts in the 1978 Columbus Green Cabs case are distinguishable from the facts here. More important, the cavalier way in which the Board determined that it was not bound by its 1974 decision is further evidence of the unsatisfactory manner in which it causes its decisions in this area to "flow." See note 21, Supra. With respect to this 1978 decision it should also be noted that it relies on some 19 enumerated items as indicating control by the lessor but a great many of said enumerated items are not probative of control over the manner and means with which the lessee-cab drivers carry out their trade and business. In this respect and elsewhere in the opinion, conclusory assertions are relied upon in place of reasoned analysis and specific discussion. Finally it appears that the Three member panel in Columbus Green Cabs (1978) (Fanning, Jenkins, Murphy) is in effect overruling the underlying holding in Greater Houston Transportation Company, 208 NLRB No. 121 (1974), which was decided by the entire membership of the National Labor Relations Board in 1974 with Members Fanning and Jenkins dissenting. In its current opinion the panel repeats many of the arguments that were rejected in Greater Houston, as we reject them here. We recognize that no two cases, particularly in this area, are precisely the same, but the repeated reiteration of factual arguments that have been rejected by the entire Board as not being probative of control should not be constantly revived as a basis for issuing what is essentially a different decision on essentially the same facts. Since the facts are substantially the same, the Agency's prior application of the statute has not been shown to be wrong and there has not been any change in the governing statute, the result should be the same. The matter is controlled by a specific statutory provision which plainly provides that "independent contractors" are not subject to the Act and which calls for the application of common law principles. The specificity of this statute, and its legislative history, deprives the Board of the same leeway to change as exists in some other areas of its jurisdiction. The Board can change its mind but it cannot change the statute. In this connection it should also be recognized, while decisions of other agencies are not controlling, that in this case and many others the Internal Revenue Service has decided that the lessee-drivers are not employees under the employment taxing acts which does not specifically exempt independent contractors. Cf. 26 U.S.C. § 3121(d).
 
 
 [23]
 See note 17, Supra
 
 
 [24]
 The Board recently restated the "right-of-control test" in Twin City Freight, Inc., S & B. Nelson, Inc., 221 NLRB 1219, 1220 (1975):
 The Board applies the common law right-of-control test in determining whether individuals are employees or independent contractors. (Citing N.L.R.B. v. United Insurance Co. of America, 390 U.S. 254 (, 88 S.Ct. 988, 19 L.Ed.2d 1083) (1968).) Under this test, an employer-employee relationship exists when the employer reserves not only the right to control the result to be achieved, but also the means to be used in attaining the result. On the other hand, where the employer has reserved only the right to control the ends to be achieved, an independent contractor relationship exists. It is clear that application of this test is not a "perfunctory exercise." In order to determine the nature of the relationship, the Board analyzes the facts presented in the particular case, balances them, and arrives at a result (Citation omitted.)
 
 
 [25]
 The thirteen factors to which the Board called attention were the following:
 (1) the lessee drivers have no investment in the instrumentalities of their work; (2) the lessee cabs display the Companies' insignia and all goodwill arising from operation of the cabs inures to the Companies' benefit; (3) the work performed by the lessee drivers is an essential part of the Companies' normal operations; (4) the lease term is short and is renewable only at the Companies' discretion; (5) the terms of the lease are unilaterally set by the Companies; (6) the lessee driver is required by the Companies, upon penalty of forfeiture of the lease, to obey a pervasive scheme of municipal regulations; (7) no subleasing is permitted; (8) the Companies discipline lessee drivers through the threat of city action; (9) the lessee drivers are, in the manner of regular employees, subject to reference checks at the time of application for a lease; (10) the Companies unilaterally determine whether a lessee driver is at fault in the event of an accident; (11) the Companies have imposed a 250-mile limitation on miles driven during the term of the lease; (12) the Companies have imposed dress restrictions on the lessee drivers; and (13) the Companies, at least arguably, provide workmen's compensation insurance for the lessee drivers.
 JA 12a-13a.
 
 
 [26]
 JA 13a ("only by ignoring business realities can it be said that these drivers exercise any real 'independence' "); Compare Member Fanning dissenting in Columbus Green Cabs, Inc., supra, 214 NLRB at 753 ("In my view, the majority is following its new direction as seen in Greater Houston Transportation, ignoring significant evidence and giving no credence to the business realities involved") (footnote omitted)
 
 
 [27]
 JA 13a, 15a-16a
 
 
 [28]
 JA 14a
 
 
 [29]
 Id
 
 
 [30]
 JA 15a
 
 
 [31]
 Restatement (Second) of Agency § 220 (1958) provides:
 § 220. Definition of Servant
 (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
 (2) In determining, whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
 (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
 (b) whether or not the one employed is engaged in a distinct occupation or business;
 (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
 (d) the skill required in the particular occupation;
 (e) whether the employer or the workman supplies the instrumentalities tools, and the place of work for the person doing the work;
 (f) the length of time for which the person is employed;
 (g) the method of payment, whether by the time or by the job;
 (h) whether or not the work is a part of the regular business of the employer;
 (i) whether or not the parties believe they are creating the relation of master and servant; and
 (j) whether the principal is or is not in business.
 
 
 [32]
 JA 61a
 
 
 [33]
 Id
 
 
 [34]
 The fact that independent drivers, who obviously are not "employees" must also follow the municipal regulations or risk suspension of their chauffeur's privileges is some indication that obedience to these rules even if compelled by one's putative employer is not an identifying characteristic of an "employee" as opposed to an "independent contractor."
 
 
 [35]
 See note 24, Supra
 
 
 [36]
 JA 61a
 
 
 [37]
 See Companies' Brief at 7; JA 41a ("The trip sheet is, as Checker President Feldman testified, the Companies' principal means of controlling the driver in order to determine whether he is doing his job properly.") (footnote omitted)
 
 
 [38]
 The Companies also provide no fringe benefits whatsoever for their lessee drivers, JA 48a (findings of the Administrative Law Judge). The Companies do carry liability insurance on each cab, but this coverage is clearly designed to insulate them from the liability imposed upon them as the owner of the cabs, not as a hidden fringe benefit to their drivers, JA 53a (findings of the Administrative Law Judge). The Companies also did not consider their lessees to be covered by workmen's compensation. Two recent decisions of the Illinois Supreme Court, Morgan Cab Co. v. Industrial Commission, 60 Ill.2d 92, 324 N.E.2d 425 (1975) and Penny Cab Co. v. Industrial Commission, 60 Ill.2d 217, 326 N.E.2d 393 (1975) have held that section 28-12 of the Chicago Municipal Code requiring that the owner of a cab "carry public liability and property damage and workmen's compensation insurance for his Employees " (emphasis added) imposes on the proprietor of a cab and the driver despite the possibility that the driver might be an independent contractor an employer-employee relationship For purposes of workmen's compensation coverage. Both these cases were explicit that their holdings were limited to the interpretation of the term "employee" for the purposes of workmen's compensation law, and thus clearly are not dispositive in the context of the National Labor Relations Act, particularly in light of the 1947 amendments to that legislation, See note 47, Infra
 That the Chicago code specifically requires Companies to pay for workmen's compensation for their lessee drivers does nothing to affect those factors which are considered fundamental to determining independent contract status under the National Labor Relations Act, See Section IIIb, Infra. Moreover, the municipal regulation requiring the proprietor of a cab to pay workmen's compensation for the driver is simply another instance of the external intrusion of government regulations, not affecting the basic relationship established consensually between the Companies and their drivers. We note that despite Section 28-12's requirement that the proprietor pay workmen's compensation, Section 28-9 provides that The relationship between the licensee and the driver of a cab may be such as is mutually agreed upon by contract. See generally JA 37a-38a (findings of the Administrative Law Judge).
 
 
 [39]
 JA 38a-39a n.7 (findings of the Administrative Law Judge). The regulation was promulgated subsequent to the hearing by the Administrative Law Judge
 
 
 [40]
 In some instances prohibiting subleasing has been considered significant in the determination of employee status, NLRB v. Pony Trucking, Inc., 486 F.2d 1039 (6th Cir. 1973), See also Ace Doran Hauling & Rigging Co. v. NLRB, 462 F.2d 190 (6th Cir. 1972)
 
 
 [41]
 JA 12a, 13a
 
 
 [42]
 Restatement (Second) of Agency § 220, comment k at pages 490-91 ("The ownership of the instrumentalities and tools used in the work is of importance. The fact that a worker supplies his own tools is some evidence that he is not a servant. On the other hand, if the worker is using his employer's tools or instrumentalities, especially if they are of substantial value, it is normally understood that he will follow the directions of the owner in their use, and this indicates that the owner is a master. This fact, is, however, only of evidential value.")
 
 
 [43]
 JA 49a (findings of the Administrative Law Judge)
 
 
 [44]
 $7,000 (actually $6886.00) is a minimum figure for the yearly investment in cab leases, as for this amount a driver would only obtain the use of a cab for some 313 days at $22.00 a day
 
 
 [45]
 For example, that the terms of the lease are unilaterally set by the companies; that the Companies prohibit sub-leasing; that all goodwill arising from the operation of the cabs inures to the Companies' benefit
 
 
 [46]
 JA 43a-44a (findings of the Administrative Law Judge)
 
 
 [47]
 It is clear that when Congress amended the Act in 1947, one of its specific purposes was to overturn two then recent Supreme Court decisions, United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); NLRB v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), which had given an unusually expansive meaning to the term "employees" in light of what it interpreted to be the policies underlying the Act. Thereafter, Congress explicitly exempted "independent contractors" from the coverage of the Act in order to exempt independent contractors from coverage because they are not employees. "(T)he obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act." NLRB v. United Insurance Company of America, 390 U.S. 254, 256, 88 S.Ct. 988, 989-990, 19 L.Ed.2d 1083 (1968); 93 Cong.Rec. 6441-6442 (remarks of Senator Taft). The House Report pointed out that: " 'Employees' work for wages or salaries under direct supervision" and "Independent contractors . . . depend for their income not upon wages but . . . upon profits." It then stated that: "To correct what the Board has done (in expanding the definition of the term 'employee' beyond anything that it ever had included before) and what the Supreme Court, putting misplaced reliance upon the Board's (theoretic) expertness, has approved, the bill (H.R. 3020) excludes 'independent contractors' from the definition of 'employee.' " House Report No. 245, on H.R. 3020, 80th Cong., p. 18, April 11, 1947; Legislative History of the Labor Management Relations Act, 1947, vol. 1, p. 309
 
 
 [48]
 See Note 47, Supra
 
 
 [49]
 There is no question that under the Act as amended in 1947 independent contractors are not included, E. g., Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO v. NLRB, 151 U.S.App.D.C. 338, 467 F.2d 392 (1972)
 
 
 [50]
 The Administrative Law Judge commented: "If the Board's decisions ended at volume 207, I would have little alternative but to find that the lessees are employees. In a line of decisions prior to that point, the Board found lessees of taxicabs to be employees within the meaning of the Act. . . . However, in Greater Houston Transportation Company d/b/a Yellow Cab Company, 208 NLRB 1020 (1974), as was pointed out by the dissenting members, the Board struck out in a new direction in this area.") JA 58a-59a
 
 
 [51]
 The fact that the same decisional inconsistency that was the basis for our reluctance to show any particular deference to the Board's decision in this case, See Section II, supra, is also the basis for the equitable argument made here, illustrates the axiom of administrative law that agencies are only entitled to deference when they act according to the rule of law, in an equitable and non-arbitrary fashion
 Concerning Yellow and Checker's efforts to model their leasing program after those that had been held to create independent contractor rather than employee drivers, the intent of the parties is not completely dispositive of the question of whether a relationship is one of employment or of independent contracting, but intent is pertinent in that it may reflect on the presence Vel non of control, See Lorenz Schneider Co., Inc. v. NLRB, 517 F.2d 445 (2d Cir. 1975); NLRB v. Colonial Press, Inc., 509 F.2d 850 (8th Cir.), Cert. denied sub nom. Local 203, Graphic Arts International Union, AFL-CIO v. Colonial Press, Inc., 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975).
 As demonstration of how successful Checker and Yellow had been in copying the leasing program instituted in Columbus Green Cabs, Inc., consider the following comments by Member Penello, dissenting from the decision of the Board in this case:
 The majority opinion attempts to distinguish this case from Columbus Green Cabs despite the fact that they are virtually indistinguishable. The following similarities exist in both cases: the Companies provide the taxicab, maintenance thereon, as well as licenses, fees, taxes, and insurance; the Companies make no deductions for Federal, State, or local taxes; the lessee driver provides his own gas; the lease agreement expressly disavows the creation of an employer-employee relationship; there are no prescribed or required hours of work for the drivers; the drivers are not required to report their location; the lessees are required to inspect their vehicles for mechanical defects at the beginning of the lease term; the lessee is not permitted to sublease to any other person; the Companies will not refuse to execute a lease because of a customer complaint unless the complaint relates to unsafe driving; and the lessee agrees to operate the taxicab in conformity with all applicable laws.
 Moreover, most of the factors upon which the majority relies in distinguishing this case from Columbus Green Cabs are not, in my opinion, indicative of an employer-employee relationship. For example, the majority cites the 250-mile-per-lease limit on drivers and the requirement that drivers have all repairs on cabs performed at the Companies' garages. These factors, however, more likely represent the Companies' efforts to preserve the life of the taxicabs they own and keep down the cost of repairs, rather than their attempts to restrict drivers' earnings or present subleasing, as asserted in the majority opinion. Moreover, by offering day and night leases, the Companies do not, as the majority contends, prescribe the drivers, hours of work. For, as their opinion also indicates, the Companies offer a 24-hour lease as well, as was the case in Columbus Green Cabs.
 Furthermore, the majority cites the existence of a provision in the lease making compliance with the pervasive scheme of municipal regulations a condition thereof, However, this provision was also present in Columbus Green Cabs. The majority asserts that this provision allows the Companies to exercise effective control over all matters covered by the regulations. But, the actual effect is just the opposite it constitutes an abdication by the Companies of control over such matters in favor of the municipal authorities.
 In sum the facts in the instant case are virtually indistinguishable from Columbus Green Cabs . . .
 JA 26a-27a (footnotes omitted).
 
 
 [52]
 In view of our determination that the lessee drivers are not employees and thus clearly not part of the same bargaining unit as the commission drivers, it is not necessary for us, as it was not necessary for the Administrative Law Judge, to pass on the Companies' alternative argument that as there are now three times as many lessee as commission drivers it would be improper to "accrete" the larger unit unto the smaller one, See JA 61a n. 18 (findings of the Administrative Law Judge)
 
 
 [53]
 JA 34a ("Indeed it is the position of the General Counsel that this (the question of whether or not the lessee-drivers were independent contractors) is the 'crux' and only substantial issue in the case, and he concedes that if the lessees are independent contractors, his complaint should be dismissed."). In their brief before this Court, the NLRB suggests only that the Companies committed an unfair labor practice in not providing information to the unions relevant to how the decision to institute leasing Would affect the commission drivers. It nowhere suggests that bargaining had to take place concerning the inauguration of leasing Per se, granting that the lessee-drivers were not employees. See Brief for the NLRB 50-53
 
 
 [54]
 29 U.S.C. § 158(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 159(a) in turn provides that collective bargaining representatives "shall be the exclusive representatives of all the employees in (the bargaining unit) for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ."
 
 
 [55]
 Brief for the Union as Intervenor in No. 77-1673 at 28-33
 
 
 [56]
 Brief for the Companies at 16-21
 
 
 [57]
 The Administrative Law Judge found that "the Union failed to prove that leasing has had any adverse impact on the commission drivers, unless the transfer of cabs to the lease garages can be deemed, Per se, to have such effect. The Union failed to prove that as a result of leasing, commission drivers have suffered diminution of income, assignment to inferior cabs, inability to obtain safe and operable cabs, or terminations or discharges for low bookings or high mileage, or that applicants for commission driving have been turned down for lack of a cab. JA 62a. The Board's response to this argument appears at JA 17a
 
 
 [58]
 The Administrative Law Judge commented that he did not see as meaningful the cab companies' proposed analogy between their leasing operations and rental car businesses because the latter exerted much less control over their renters than the former did over their drivers and, in addition, the rental agencies uniformly prohibited the use of their autos as taxicabs. JA 50a. The differences pointed out by the Administrative Law Judge unquestionably do exist; however, the essential basis of the analogy is not the use or degree of control exerted or the types of car usage prohibited by lessor cab companies and rental agencies, but rather that both enterprises base their income on a flat rate payment by the lessee unconnected with any profit he himself may realize from the use of the car
 
 
 [59]
 The original denial of enforcement of the Board's order was reported in NLRB v. Adams Dairy, Inc., 322 F.2d 553 (8th Cir. 1963). The Board thereafter petitioned for certiorari which was granted on January 18, 1965. Thereafter, by per curiam order, the prior judgment of the Eighth Circuit was vacated and the case remanded for reconsideration in light of Fibreboard. 379 U.S. 644, 85 S.Ct. 613, 13 L.Ed.2d 550 (1965). Upon remand, the Eighth Circuit found that Fibreboard did not affect its earlier decision. The Board again applied for certiorari which was denied, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966)
 
 
 [60]
 JA 44a (Findings of the Administrative Law Judge)
 
 
 [61]
 The union denounced the decision to institute leasing as an anti-union attack, JA 45a (findings of the Administrative Law Judge), but other than such self-serving statements, there was no doubt whatsoever concerning the declining profitability of the commission cab operation, the need for a rate increase, and the "serious conditions" in the cab industry in general. Indeed, the Union president himself acknowledged these problems, JA 43a-44a (findings of the Administrative Law Judge) See note 6, Supra
 
 
 [62]
 The reason for this reluctance was aptly expressed by this court in UAW v. NLRB, 152 U.S.App.D.C. 274, 276, 470 F.2d 422, 424 (1972) ("What the UAW would have us do (by mandating bargaining on such economically motivated decisions) would turn over the management to it.")
 
 
 [63]
 JA 62a (findings of the Administrative Law Judge)
 The Board did not question the findings that "the Union adamantly sought to condition negotiations upon its being recognized as the bargaining representative of the lessee drivers," but rather held that this intransigence was "immaterial," JA 17a.
 
 
 [64]
 JA 17a
 
 
 [65]
 JA 45a-46a (findings of the Administrative Law Judge)
 
 
 [66]
 There is no need to become embroiled in the quandary of whether if the Companies had not arrived at a "preordained" decision to commence leasing the Union might itself have been less intransigent. The fact that the Companies strongly supported leasing does not mean that they had precluded all meaningful collective bargaining. Even assuming that they were not prepared to compromise on the basic concept of leasing, many of the details appear to have been open to compromise and discussion. It was the Union's refusal to engage in Any discussions unless recognized as the bargaining representative for the lessee-drivers which precluded negotiation, together with its own premature abandonment of collective bargaining in order to pursue its adamant opposition to any leasing in other forms
 
 
 [67]
 JA 46a (findings of the Administrative Law Judge)
 
 
 [68]
 The Act was framed with a recognition that refusals to negotiate had been a major cause of industrial unrest, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In light of Congress' concern to eliminate this cause of unrest by encouraging and in some cases compelling, collective bargaining, the Union's refusal to negotiate was clearly violative of the spirit of the Act whose protection it is now attempting to invoke. See generally, International Union of Electrical Radio and Machine Workers, AFL-CIO v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, Cert. denied sub nom. Tiidee Products, Inc. v. International Union of Electrical Radio and Machine Workers, AFL-CIO, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970)
 
 
 [69]
 The Board also held that the Companies had violated 8(a)(5) and (1) of the Act by refusing to give the Union information it requested concerning a.) the number of new cabs purchased and placed into use in 1972-1975 and whether any new cabs had been ordered for assignment to drivers not covered by the collective bargaining contract (I. e., lessees); b.) the reasons for each employee termination in the years 1973-1975; and c.) the Companies' operating statements and tax returns from 1973 to date. Although the duty to bargain in good faith obliges the employer to furnish information necessary for the union to act intelligently on its grievances, NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); Torrington Co. v. NLRB, 545 F.2d 840 (2d Cir. 1976), we agree with the Administrative Law Judge that the Companies were under no obligation to furnish any of this information. JA 62a-64a
 The basic reason for our conclusion that Yellow and Checker were not required to provide the data requested by the Union is that this data related to the Companies' decision to institute leasing and this decision was, as we have explained above, not a mandatory subject of bargaining. In addition, as the Union represented only the commission drivers, the information it requested would not "ordinarily (be) relevant to its performance as bargaining representative" and in such cases the courts have required "a special showing of pertinence before obliging the employer to disclose," Prudential Insurance Company of America v. NLRB, 412 F.2d 77, 84 (2d Cir.), Cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969); See NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); San Diego Newspaper Guild, Local No. 95 of Newspaper Guild, AFL-CIO, CLC v. NLRB, 548 F.2d 863 (9th Cir. 1977). In order to prevail the Union would at least have been required to demonstrate, as the information requested concerned individuals outside the bargaining unit, that it was relevant to some bargainable issue, NLRB v. Rockwell-Standard Corp., Transmission & Axle Division, Forge Division, 410 F.2d 953 (6th Cir. 1969); Curtiss-Wright Corp. v. NLRB, 347 F.2d 61 (3d Cir. 1965). The Union made no such showing.
 In addition to this underlying justification for the Companies' action, several additional factors supporting their refusal to divulge the information are significant. In arriving at their collective bargaining agreement, the parties had specifically included a provision, Article VI, Section 4 (JA 79a) providing that the Companies must notify the Union within thirty days of any separation of an employee from employment. Nothing whatsoever was said about notifying the Union of the reasons for this termination. Accordingly, by the terms of the agreement itself, there was no obligation to provide the additional information requested. In regard to the request for financial statements, this was made After the June 5 and 17 meetings at which the Union's position had precluded negotiation. By this point, the Union had forfeited its opportunity to negotiate and was not entitled to further information. Moreover, the Companies' financial statements were on file with the City of Chicago, and the fact that the Union never examined them suggests that this particular request for information was meant largely for the purpose of harassment, not bargaining. An employer is not obliged to disclose his financial statements merely because they might be helpful to a union, E. g., C-B Buick, Inc. v. NLRB, 506 F.2d 1086 (3d Cir. 1974), and the Union presented no specific question relevant to its role as collective bargaining agent which required recourse to the Companies' balance sheets.
 
 
 [70]
 See Retail Clerks Union, Local 1401, R.C.I.A. v. NLRB, 149 U.S.App.D.C. 370, 374, 463 F.2d 316, 320 (1972); Riverside Press, Inc. v. NLRB, 415 F.2d 281, 284-295 (5th Cir. 1969), Cert. denied, 397 U.S. 912, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970)
 
 
 [71]
 Brief for NLRB at 54; 29 U.S.C. § 160(e); NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 322, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); Marshall Field & Co. v. NLRB, 318 U.S. 253, 255-256, 63 S.Ct. 585, 87 L.Ed. 744 (1943)
 
 
 [72]
 JA 64a-65a (findings of the Administrative Law Judge)
 
 
 [73]
 The scope of the mandatory bargaining subjects, "wages, hours, and other terms and conditions of employment," has been broadly construed, 5 Kheel, Labor Law 19-4 (1974)
 
 
 [74]
 For example, one cab driver testified that the arrangement enabling him to take his cab home at night was worth some $46 a day to him, JA 64a (findings of the Administrative Law Judge)
 
 
 [75]
 The Board and the Administrative Law Judge were in agreement that Yellow and Checker had committed an unfair labor practice in this aspect of the case. JA 24a, 67a, 69a. There is no question that the Union was the recognized bargaining agent for the commission drivers and thus had to be consulted concerning a change in the terms of their employment, National Labor Relations Act § 8(a)(5), (d), as amended, 29 U.S.C. § 158(a)(5), (d)
 
 
 [76]
 Although in many of the cases where the employer has changed the conditions of employment unilaterally there is clear indication of anti-union animus, E. g., Wil-Kil Pest Control Co. v. NLRB, 440 F.2d 371 (7th Cir. 1971), there is no need of demonstrating such motivation in order to prove the commission of an unfair labor practice. NLRB v. Katz, 369 U.S. 736, 747, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 ("It follows that the Board may hold such unilateral action to be an unfair labor practice in violation of § 8(a)(5), without also finding the employer guilty of overall subjective bad faith.")
 
 
 [77]
 An employer may change terms of employment without bargaining to impasse if he has given a reasonable opportunity for counter-proposals from the Union, NLRB v. Citizens' Hotel Co., 326 F.2d 501 (5th Cir. 1964); NLRB v. Tex-Tan, Inc., 318 F.2d 472, 479-481 (5th Cir. 1963); See A.H. Belo Corporation (WFAA-TV) v. NLRB, 411 F.2d 959, 970 (5th Cir. 1969), Cert. denied, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970)
 
 
 [78]
 Brief for Union as Petitioner in No. 77-1512 at 23-25
 
 
 [79]
 JA 67a-68a (findings of the Administrative Law Judge adopted by the Board)
 
 
 [80]
 See note 65, Supra
 
 
 [81]
 JA 64a (findings of the Administrative Law Judge) ("President Feldman testified that he had uniformly demanded adherence to the rule which required drivers to check in their cabs at the end of each shift.")
 
 
 [82]
 See note 74, Supra
 
 
 [83]
 Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943) is explicit concerning how limited the court's scope of review of a Board's remedial order was intended to be under the Act:
 (A Board remedy may not be overturned) unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.
 
 
 [84]
 Brief for the Union as Petitioner in No. 77-1512 at 11. The Union also argues that the rate of interest which the Board assesses on its monetary awards is inadequate. Although the 6% Rate assessed by the Board in this case has since been revised somewhat upward by the Board, Florida Steel Corp., 231 NLRB No. 117 (1977), at the time the Board heard this case the 6% Rate had been the Board's policy for some fifteen years, and had repeatedly been upheld by the courts, See Reserve Supply Corporation v. NLRB, 317 F.2d 785, 789 (2d Cir. 1963); Russell Motors, 198 NLRB 351, Enf'd 481 F.2d 996, 1006-1007 (2d Cir. 1973). The setting of an appropriate interest rate, comes within the Board's traditionally broad discretion in fashioning remedies, E. g., NLRB v. Gissel Packing Co., 395 U.S. 575, 612, 89 S.Ct. 1918, 23 L.Ed.2d 547 n.32 (1969); Amalgamated Local Union 355 v. NLRB, 481 F.2d 996, 1006-1007 (2d Cir. 1973)
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.C. § 293(a)
 
 
 [1]
 Petition for Rehearing (Local 777) 1 (hereinafter Union Petition)
 
 
 [2]
 195 U.S.App.D.C. at ---, 603 F.2d at 872
 
 
 [3]
 Petition for Rehearing (NLRB) 9 (hereinafter NLRB Petition); Union Petition 12-14
 
 
 [4]
 See, e. g., NLRB v. Local 103, Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), NLRB v. United Insurance Co., 390 U.S. 254, 259, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968)
 
 
 [5]
 United Insurance, supra, 390 U.S. at 260, 88 S.Ct. 988
 
 
 [6]
 See also United States v. First City Nat'l Bank of Houston, 386 U.S. 361, 368, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), and Farmingdale Supermarket, Inc. v. United States, 336 F.Supp. 534, 536 (D.N.J.1971)
 
 
 [7]
 229 NLRB at 1334
 
 
 [8]
 The court's opinion states:
 (The Board) has tended to rely on a variety of factors some of which are of only marginal relevance while glossing over the fundamental question of whether or not the putative employer has the right to control the driver during the course of his operation of the cab in the manner and means in which he earns his income and whether the drivers can be most aptly described as working for themselves or for a wage they receive from companies.
 . . . We deny enforcement of the Board's order because we are able to determine that the lessees in this case were independent contractors.
 195 U.S.App.D.C. at ---, ---, 603 F.2d at 874, 882.
 because of the Board's history of vacillation and the basically legal nature of the question before us, it is inappropriate for this court to extend any great amount of deference to the Board's disposition of the problem of whether or not Yellow and Checker's lessee-drivers are employees or independent contractors.
 
 
 [9]
 229 NLRB at 1333
 
 
 [10]
 Accord: NLRB v. Local 103, Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978)
 
 
 [11]
 229 NLRB 1329, 1333. The Board also lists factors that it claims distinguish the instant case from Columbus Green Cabs I, 214 NLRB 751 (1974), an earlier case in which the Board held that lessee cab drivers were independent contractors. As Justice Marshall stated, "(t)hose factual differences serve to distinguish the cases only when some legislative policy makes the differences relevant . . . ." Atchison, Topeka & Santa Fe Railway Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (plurality opinion for four Justices). Our opinion explains why the factors cited by the Board are largely irrelevant to the issue of control, which determines whether a worker is an "employee" or an "independent contractor." 195 U.S.App.D.C. at ---, ---, 603 F.2d at 874-881
 
 
 [12]
 229 NLRB at 1333
 
 
 [13]
 229 NLRB at 1333. 195 U.S.App.D.C. --- - --- at nn. 20, 22, 603 F.2d 869-871 at nn. 20, 22
 
 
 [14]
 See cases and authorities cited in 195 U.S.App.D.C. at ---, ---, 603 F.2d at 872, 882
 
 
 [15]
 For example, in Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951) the Supreme Court
 direct(ed) that courts (of appeal) now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds . . . .
 
 
 [16]
 In Weingarten, the Board's order was enforced because "the Board's construction there, while it may not be required by the Act, is at least permissible under it . . . ." 420 U.S. at 266-67, 95 S.Ct. at 968
 
 
 [17]
 See Allied Chemical & Alkali Workers v. Pittsburgh Glass Co., 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1977):
 We have repeatedly affirmed that the task of determining the contours of the term "employee" "has been assigned primarily to the agency created by Congress to administer the Act." NLRB v. Hearst Publications, 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). See also Iron Workers v. Perko, 373 U.S. 701, 706, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963); NLRB v. Atkins & Co., 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947). But we have never immunized Board judgments from judicial review in this respect. "(T)he Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publications, supra, 322 U.S. at 131, 64 S.Ct. 861.
 One could argue that the language in Chemical Workers discussing the Board's broad discretion to determine which workers are employees exceeds the intention of Congress when it repudiated Hearst And adopted the 1947 amendment excluding independent contractors from the definition of employees. In any event, that discretion in the Board that Hearst referred to is lessened when independent contractors are involved because of the 1947 amendments which followed the 1944 decision in Hearst and narrowed the range of discretion by specifically excluding them. The resulting decision thus becomes more one of law where independent contractors are concerned. The Board's discretion is greater when considering other forms of relationships.
 
 
 [18]
 434 U.S. at 350, 98 S.Ct. at 660. The Supreme Court distinguished the facts in Iron Workers from those in American Ship Building v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), which reversed the Board because its (the Board's) decision was inconsistent with the Act
 
 
 [19]
 390 U.S. at 260, 88 S.Ct. at 991 (emphasis added)
 
 
 [20]
 See 195 U.S.App.D.C. at --- n.25, 603 F.2d at 873 n.25
 
 
 [21]
 229 NLRB at 1330
 
 
 [22]
 229 NLRB at 1333
 
 
 [23]
 229 NLRB at 1332
 
 
 [24]
 229 NLRB at 1332
 
 
 [25]
 229 NLRB at 1332
 
 
 [26]
 195 U.S.App.D.C. at --- n.45, 603 F.2d at 878 n.45
 
 
 [27]
 229 NLRB at 1333
 
 
 [28]
 229 NLRB at 1330
 
 
 [29]
 See, e. g. NLRB v. A. S. Abell Co., 327 F.2d 1 (4th Cir. 1964) (Held newspaper carriers are independent contractors despite "the almost-at-will terminability of the relationship." 327 F.2d at 3. "The essential business decisions concerning the operation of his route are largely within the discretion of the carrier and, like most independent businessmen, he may either reap the profits or bear the losses which are the consequences of his judgments." 327 F.2d at 7.); Portage Transfer Co., Inc., 204 NLRB 787 (1973). But cf.: Joint Council of Teamsters No. 42 v. NLRB, 146 U.S.App.D.C. 275, 280, 450 F.2d 1322, 1327 (1971) (affirmed the Board's determination that truck owner-operators were employees because the employers either "explicitly reserved the right to supervise the work" or "in practice had exercised pervasive control over the owner-operators"; stated in Dictum that a truck driver "may be deemed an employee rather than an independent contractor, if the principal explicitly or implicitly reserves the right to supervise the details of his work.") Joint Council is not inconsistent with the result we reach because the Companies do not reserve the right to control the details of the lessee drivers' work, nor do they in fact exercise pervasive control
 
 
 [30]
 See Local 814, I.B.T. (Santini Brothers), 223 NLRB 752 (1976), Aff'd, Local 814, Int'l Bhd. of Teamsters v. NLRB, 178 U.S.App.D.C. 223, 546 F.2d 989 (1976), Cert. denied, 434 U.S. 818, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977)
 
 
 [31]
 223 NLRB at 753
 
 
 [32]
 In Columbus Green Cabs I, 214 NLRB 751 (1974) the Board found that lessee drivers were independent contractors despite a no subleasing provision. The Board in a later decision held in Columbus Green Cabs II, 237 NLRB No. 176 (1978) that the drivers were employees. The Board said it changed its position "based on an expanded current record" which included significant additional evidence of control. 237 NLRB No. 176 at 6. See 195 U.S.App.D.C. at ---, n.22, 603 F.2d at 871, n.22. The subleasing provision, therefore, is not overwhelmingly important
 
 
 [33]
 Perhaps this is why the Board's petition for rehearing referred to the "pervasive scheme of municipal regulations" (at 7), but did not even mention the Companies' requirement that these regulations be followed
 
 
 [34]
 The Board states that Employees' references undergo similar checks, but the similarities in the method of handling the applications does not in any way indicate Any control over drivers. Reference checks are a common business practice in non-employee situations (e. g. apartment leasing, bank loans, franchise agreements); this is not evidence that the lessee drivers are employees. Such checks are required by the law to weed out those with certain criminal records if the owner of an automobile wants to protect his property against forfeiture to the government for carrying contraband drugs. That a lessor follows the practice of only contracting with responsible persons is no indication of control over such person's actions
 
 
 [35]
 229 NLRB at 1331
 
 
 [36]
 The Board did not mention this factor in its petition, and the Board's opinion never explains how this factor is relevant to control. Yellow Cab Co., 229 NLRB at 1332-33
 Cf. Joint Council of Teamsters No. 42 v. NLRB, 146 U.S.App.D.C. 275, 286, 450 F.2d 1322, 1333 (1971).
 
 
 [37]
 App. 53a
 
 
 [38]
 229 NLRB at 1332
 
 
 [39]
 App. 56a. Companies' Response to the Petition for Rehearing 9 n.7. Neither the Board's opinion nor the petitions for rehearing state the nature of the supposedly significant dress restrictions
 
 
 [40]
 App. 56a
 
 
 [41]
 Union Petition 5
 In SIDA of Hawaii, Inc. v. NLRB, 512 F.2d 354, 358-59 (9th Cir. 1975) the Court reversed a Board order and held that lessee drivers were independent contractors despite an extensive dress code requiring uniforms and name tags. No petition for rehearing was filed.
 
 
 [42]
 229 NLRB at 1333
 
 
 [43]
 229 NLRB at 1332-33
 
 
 [44]
 Local 814, I.B.T. (Santini Brothers), 233 NLRB 752 (1976)
 
 
 [45]
 195 U.S.App.D.C. at ---, 603 F.2d at 875 Quoting 4 Kheel, Labor Law 14-139 (1978)
 
 
 [46]
 The "hiring of others" referred to was a general reference to the relationship of artisans, and not to those instances where the work by its nature is not transferrable. This minimal restriction on the lessee drivers' freedom pointed to by the Board and the Union is not sufficient to change the drivers' status to that of "employees" obviously only one person can drive a cab at one time and contracting on that basis is not pervasive control
 
 
 [47]
 NLRB Petition 8
 
 
 [48]
 JA 58a-61a
 
 
 [49]
 322 U.S. at 130, 64 S.Ct. at 860
 
 
 [50]
 229 NLRB at 1332
 
 
 [51]
 229 NLRB at 1333
 
 
 [52]
 Allied Chemical, supra, also stated: "we have never immunized Board judgments (as to which persons are 'employees' under the Act) from judicial review." 404 U.S. at 166, 92 S.Ct. at 390
 
 
 [53]
 229 NLRB at 1333
 
 
 [54]
 195 U.S.App.D.C. ---, 603 F.2d 886. The Court also noted that the decision to lease was probably not a mandatory subject of bargaining under Fibreboard, supra. But because of the "ambiguity" in that area of the law, the Court's decision rested on the Union's preclusion of bargaining
 
 
 [55]
 NLRB Petition 10
 
 
 [56]
 Union Petition 13
 
 
 [57]
 JA 47a
 
 
 [58]
 JA 62a (emphasis added)
 
 
 [59]
 229 NLRB 1329. The Board's petition for rehearing, of course, does not challenge this factual conclusion. The Union, however, argues that "there are two kinds of bargaining obligations": (1) bargaining about the decision to lease, and (2) bargaining about the effects of that decision. The Union maintains that it only required recognition as a prerequisite to bargaining about the effects of the leasing decision. The ALJ's and Board's opinions do not support this claim, and the Union cites no evidence that does
 
 
 [60]
 229 NLRB at 1334
 
 
 [61]
 R. Gorman, Basic Text on Labor Law 528 (1976). See NLRB v. Sheet Metal Workers Int'l Ass'n, 575 F.2d 394, 398 (2d Cir. 1978)
 
 
 [62]
 Accord: NLRB v. Retail Clerks Int'l Ass'n, 203 F.2d 165, 169-70 (9th Cir. 1953), Cert. denied, 348 U.S. 839, 75 S.Ct. 47, 99 L.Ed. 662 (1954) (union may not insist on representing supervisors who are not employees)
 
 
 [63]
 See Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 172, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (Held that retirees' benefits are not a mandatory subject of bargaining, although employees' benefits are a mandatory subject: (1) "pensioners are not 'employees' within the meaning of the collective-bargaining obligations of the Act"; and therefore, (2) "they were not and could not be 'employees' included in the bargaining unit."); Retail Clerks, supra at n.61
 
 
 [64]
 229 NLRB 1329
 
 
 [65]
 NLRB Petition 10-11
 
 
 [66]
 It is well established that the findings of the administrative law judge are a part of the entire record and must be considered by the Court when it determines whether the Board has decided in accordance with substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Int'l Bhd. of Teamsters v. NLRB, 190 U.S.App.D.C. 279, 283, 587 F.2d 1176, 1180 (1978); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 396, 444 F.2d 841, 853 (1970) (Leventhal, J.)
 
 
 [67]
 NLRB Petition 10
 
 
 [68]
 Complaint, Yellow Cab Co. v. Local 777, No. 13-CA-14142, at 4
 
 
 [69]
 See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138-39, 142, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)
 
 
 [70]
 JA 46a (ALJ opinion)
 
 
 [71]
 Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Ace Motor Freight, Inc. v. ICC, 181 U.S.App.D.C. 236, 241, 557 F.2d 859, 864 (1977)
 
 
 [72]
 See JA 47a, cited in text at n.56
 
 
 [73]
 JA 45a (ALJ opinion)
 
 
 [74]
 JA 46a (ALJ opinion)
 
 
 [75]
 Id
 
 
 [76]
 JA 48a
 
 
 [77]
 Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass, 427 F.2d 936, 945 (6th Cir. 1970), Aff'd, 404 U.S. 157, 165, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971)
 
 
 [78]
 229 NLRB at 1330 (footnote omitted). Justice Brennan in Allied Chemical, supra, remarked: "(T)he term 'employee' is not to be stretched beyond its plain meaning, embracing Only those who work for another For hire." 404 U.S. at 166, 92 S.Ct. at 391 (emphasis added)
 
 
 [79]
 JA 48